**In the Interest of JOHN DOE**, Born on July 27, 1988, Juvenile

NO. 15900

(FC–S NO. 88–01017)

MARCH 11, 1993

LUM, C.J., MOON, KLEIN, AND LEVINSON, JJ. AND INTERMEDIATE COURT OF APPEALS CHIEF JUDGE BURNS, IN PLACE OF WAKATSUKI, J., DECEASED

*Per curiam.* Appellant, the Department of Human Services (DHS), appeals orders of the family court which directed the DHS to continue making foster board payments to the relative caretakers/prospective adoptive parents of a child, John Doe (Doe), until the adoption process was completed.[1] The DHS, consistent with its

---

[1] The Guardian Ad Litem (GAL) represents Doe's interests and, as such, is the Appellee.

administrative rules, had terminated board payments approximately three months prior to the completion of the adoption process, after the relative–caretakers had signed an adoption agreement and upon the initial filing of a subsequent petition for adoption. The family court found that the adoption agreement between the DHS and the relative–caretakers, which allowed the termination of the payments prior to the completion of the adoption process, was against public policy and the DHS's duty to provide for the child pursuant to Hawaii Revised Statutes (HRS) § 587–2 (Supp. 1991). We reverse.

## I. **Facts**

After the death of his mother in January 1990, Doe, then one and one–half years old, was placed in a foster home by his temporary foster custodian, the DHS. The foster family to whom the DHS had immediately started making board payments consisted of Doe's maternal step–grandfather and his wife (Grandparents).[2] Doe's natural father, who had never lived with the child, signed a voluntary consent for Grandparents to adopt Doe on May 23, 1990.

On July 21, 1991, approximately eighteen months after placement, Grandparents signed an "Agreement Between Department [DHS] And Prospective Parents." This agreement expressly required Grandparents to accept full responsibility for the care and support of Doe, thus implicitly permitting the DHS to discontinue its foster board payments. The petition for adoption was

---

[2] Grandparents were also the foster caretakers of Doe immediately after he was born while the mother was going through drug rehabilitation programs. After he was returned to his mother's custody, Doe and his mother lived with Grandparents until shortly before mother's death.

initially filed on August 22, 1991, but was rejected by a filing clerk due to an apparent conflict of interest involving Doe's GAL who had filed the petition. The board payments ceased as of September, 1991, the first month following the initial filing of the petition for adoption. The petition was properly filed shortly after a September 19, 1991 hearing wherein the court, upon discovering that board payments had ceased, *sua sponte* ordered the DHS to resume making foster board payments to Grandparents until the completion of the adoption process. On October 24, 1991, the court heard the DHS's motion for reconsideration of the order reinstating foster board payments. Grandparents adopted Doe effective November 27, 1991. The Findings of Fact, Conclusions of Law, and Order Denying Motion for Reconsideration (filed January 14, 1992) provided that the "DHS shall retroactively reinstate foster board payments to the foster parents as long as the child remains in placement." The Supplemental Findings of Fact and Conclusions of Law (filed March 9, 1992) provided in part that "[a]s long as the DHS is the foster custodian of the child, to draft or draw contracts in derogation of their duty to support the child is against public policy."

## II. Discussion

The DHS raises three issues: first, the family court has no jurisdiction to order distribution of funds which are not in the DHS's budget; second, the parties have not exhausted their administrative remedies; and third, the agreement between the DHS and Grandparents is valid and consistent with public policy. Although the DHS's first two arguments hold no merit, we agree with the DHS on its third argument and reverse the order of the family court.

## A. **Jurisdiction**

The DHS asserts that HRS § 587–82 (1985 and Supp. 1992) divests the family court of jurisdiction to issue orders concerning funds not in the DHS's budget. HRS § 587–82 provides:

**Fiscal responsibility.** The court, the department, or other authorized agency shall provide only the care, service, treatment, or support, or the payment for care, service, treatment, or support, as is set forth in the budget of the court, the department, or authorized agency and is authorized by law.

HRS § 587–82 does not limit the jurisdiction of the court. Moreover, it is specious to argue that the DHS can control the court's jurisdiction over certain matters by simply rearranging its budget to avoid statutorily imposed responsibilities to care for foster children. Once the court is invested with jurisdiction pursuant to HRS § 587–11 (Supp. 1992), it may issue appropriate orders to protect the interests of a foster child. The court's order in the instant case was clearly within its jurisdiction, notwithstanding our opinion that the family court erred.

## B. **Exhaustion of remedies**

The DHS argues that if Grandparents or the appellee/GAL disagreed with its decision to terminate payments as of September 1991, prior to final adoption on November 27, 1991, then they should first be required to exhaust their administrative remedies prior to any judicial resolution. The doctrine of exhaustion of administrative remedies is concerned with the question of timing of *requests* for judicial intervention in the administrative process. *Kona Old Hawaiian Trails Group v. Lyman*, 69 Haw.

81, 93, 734 P.2d 161, 168 (1987). The DHS's argument fails to note, however, that the family court's January 14, 1992 order prohibiting the DHS from terminating foster board payments to the proposed adoptive parents prior to the completion of the adoption was entered *sua sponte* by the court; none of the parties "requested" judicial intervention on this issue. In such a circumstance, the issue is ripe for appeal.

### C. **Public policy**

The DHS submits that terminating foster board payments prior to the completion of the adoption process does not violate public policy. The family court's decision on this issue is a conclusion of law. Accordingly, we review its decision under the right/wrong standard of review. *Maria v. Freitas*, 73 Haw. 266, 270, 832 P.2d 259, 262 (1992); *In Interest of Doe*, 7 Haw. App. 547, 557, 784 P.2d 873, 880 (1989).

The DHS's argument is straightforward. HRS § 587–2 imposes upon the DHS, as the foster custodian, a duty "[t]o assure that the child is provided in a timely manner with adequate food, clothing, shelter, psychological care, physical care, medical care, supervision, and other necessities." To fulfill this duty, the DHS evaluates prospective foster homes to determine their suitability for possible placement of a child. Additionally, after placement, the DHS grants the foster care providers foster board payments for the duration of the child's temporary stay. However, if a family is found that is willing and able to adopt the child, the DHS asserts that it also has a duty under HRS § 578–8 (Supp. 1991) to ensure that the prospective adoptive family is financially able to care for the

child without financial assistance from the State. The DHS cites parts of HRS § 578–8 to support this assertion:

> After considering the [adoption] petition and such evidence as the petitioners and any other properly interested person may wish to present, the court may enter a decree of adoption if it is satisfied . . . (3) *that the petitioners are fit and proper persons and financially able to give the individual a proper home and education*, if the individual is a child . . .
>
> Before entering the decree, the court shall notify the director of human services . . . of the pendency of such petition for adoption and *allow a reasonable time for the director . . . to make such investigation as the director . . . may deem proper as to the fitness of the petitioners to adopt the individual*[.]

(Emphasis added.)

Consistent with its responsibility under HRS § 578–8 to investigate the financial fitness of the adoptive family, the DHS adopted Administrative Rule § 17–828–8(2), which provides in pertinent part that "[f]oster care services and payment shall be terminated when the child . . . [g]oes into an adoptive home." Consequently, the DHS terminated "services and payment" in the month succeeding the initial, albeit erroneous, filing of the petition for adoption.[3] The DHS asserts that from the time of the

---

[3] The original August 1991 filing of the petition for adoption, from which date the DHS terminated board payments, was invalid. The actual filing did not occur until one month later. Therefore, according to the DHS's own practice in this case, the September board payments should not have been terminated. Instead, the foster board payment termination should have been effective beginning in October 1991.

filing of the adoption petition, which petition included the signed adoption agreement, it had a continuing responsibility to monitor the well–being of the child to ensure that Grandparents were financially able to care for the child exclusive of the board payments from the DHS. We agree.

*In Interest of Doe Children*, 73 Haw. 15, 827 P.2d 1144 (1992), cited by appellee/GAL, is unavailing. In *Doe Children*, we held that DHS rules which did not provide for foster board payments to relative–caretakers, as opposed to rules which provided payments to non–relative caretakers, were invalid and unenforceable as being contrary to the statutory policy of encouraging placement of foster children with relatives. No such discrimination exists in the situation currently under review. The DHS would terminate payments to *any* prospective adoptive family once the adoption process had formally commenced.

In deciding that the agreement between the DHS and Grandparents was void as against public policy, the family court failed to consider the responsibility imposed upon the DHS by HRS § 578–8 to aid in the court's determination of the financial ability of the prospective adoptive parents. Moreover, a financially stable home is essential if the DHS is to fulfill its responsibility under HRS § 587–2 to "assure that the child is provided in a timely manner with adequate food, clothing, shelter, psychological care, physical care, medical care, supervision, and other necessities." Such a determination is facilitated through an evaluation of the prospective adoptive home absent the benefit of state funds. We therefore hold that the family court erred in concluding that the adoption agreement violated public policy. Accordingly, we reverse the order of

the family court reinstating foster board payments and remand for action consistent with this opinion.

*Jay K. Goss* (*John Campbell, Jr.* with him on the brief), Deputy Attorneys General, for appellant.

*Patrick A. Pascual*, Guardian Ad Litem, for appellee.