30 P.3d 878

**In the Interest of DOE Children: Jane, Born on September 2, 1983; and John, Born on May 12, 1983.**

**In the Interest of John Doe, Born on November 10, 1988.**

No. 23149.

Supreme Court of Hawai'i.

Aug. 30, 2001.

Julio Herrara, Deputy Attorney General (Jay K. Goss and Mary Anne Magnier, with him on the briefs in No. 23149; and Catherine A. Kendrick, Jay K. Goss, and Mary Anne Magnier, on the briefs in No. 23640) for appellant Department of Health, State of Hawai'i.

James T. Wada, Guardian Ad Litem for appellee Jane Doe in No. 23149.

Matthew T. Ihara, Guardian Ad Litem for appellee John Doe in No. 23640.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by MOON, C.J.

In these two consolidated cases, the Hawai'i Department of Health (DOH) appeals from orders of the Family Court of the First Circuit requiring DOH to pay for mental health services received by two children— Jane in original appeal No. 23149 and John in original appeal No. 23640 (collectively, Children), and subsequent orders denying reconsideration of same.[1] In each case, the family court's orders were issued following a review hearing held pursuant to Chapter 587 of the Hawai'i Revised Statutes (HRS), the Child Protective Act. Under Chapter 587, the family court may obtain jurisdiction in a proper case and order a child, his or her family, and relevant state agencies to participate in service planning necessary to prevent further harm to a child who is subject to threatened harm or to prevent harm to a child who has already been harmed. *See* HRS § 587–11 (1993), quoted *infra*, at 285, 30 P.3d at 891. The family court is required to conduct periodic hearings to review and update the service plan and may issue orders in the child's best interest. *See generally* HRS §§ 587–72 (Supp.2000) and 587–73 (Supp.2000). In addition to their status as children in need of protection under Chapter 587, Children are also children with special educational needs who are eligible to receive special education and related services from the Hawai'i Department of Education (DOE) and DOH under the Individuals with Disabilities Edu-

cation Act (IDEA), codified at 20 U.S.C. § 1400 *et. seq.* (Supp. V 1999).[2] Moreover, Children are members of the plaintiff class as defined in the consent decree in *Jennifer Felix et al. v. Benjamin Cayetano, et al.,* Civil No. 93–00367 DAE (D.Haw. Oct. 25, 1994) (Order Granting Approval of Consent Decree) [hereinafter, *Felix*], which acknowledges that the State of Hawai'i (State) has violated the IDEA by failing to provide required services to children with disabilities.[3] In Jane's case, the family court ordered DOH to pay for her treatment at Excelsior Youth Center, Inc., in Aurora, Colorado [hereinafter, Excelsior], a residential treatment center. In John's case, the family court ordered DOH to pay for mental health services that were arguably not provided by John's existing insurance plan.

The issue presented in both appeals is whether the family court was authorized to order DOH to pay for the services received. DOH argues that the family court erred because the issue of who should pay for Children's services is an issue that arises under the IDEA, and that, under the IDEA, the family court does not have jurisdiction to determine who should pay for the services. On the other hand, Children, through their guardians ad litem, argue that the family court has jurisdiction under HRS chapter 587 because the family court has very broad authority to act in their best interest, including the ability to order DOH to pay for services needed to prevent harm.

---

1. The proceeding in original appeal No. 23149 dealt with both Jane and a sibling. The order from which DOH appeals relates only to Jane. The proceeding in original appeal No. 23149 was first heard by the Honorable Marilyn Carlsmith, District Family Court Judge of the First Circuit. The motion for reconsideration was heard by the Honorable R. Mark Browning, District Family Court Judge of the First Circuit. The proceeding in original case No. 23640 was heard by the Honorable Bode A. Uale, District Family Court Judge of the First Circuit. On March 12, 2001, both cases were consolidated under No. 23149 for purposes of oral argument and disposition. Oral argument was held on May 3, 2001.

2. All references to the IDEA in this opinion are to the 1999 version of Title 20 of the United States Code.

3. The *Felix* plaintiff class includes "all children and adolescents with disabilities residing in Hawaii ... who are eligible for and in need of education and mental health services [pursuant to the IDEA] but for whom [such services] are either unavailable, inadequate, or inappropriate...." *Felix* Consent Decree at 4. One purpose of the consent decree is "to ensure that the [p]laintiff [c]lass has available to them the free appropriate public education they are entitled to under the [IDEA]." *Id.* at 1. The decree references a May 24, 1994 order by the United States District Court for the District of Hawai'i holding that the State has "systematically failed to provide required and necessary educational and mental health services to qualified handicapped children of the State of Hawai'i in violation of the [IDEA]." *Id.* at 3–4.

For the reasons discussed herein, we hold that the claim that DOH is legally obligated to pay for Jane's services at Excelsior is one that arises under the IDEA. Because Jane did not pursue the remedies available under the IDEA to establish DOH's obligation to pay for the services, we further hold that the family court lacked jurisdiction to order DOH to pay for Jane's services. Therefore, we vacate the family court's order in Jane's case and remand for dismissal of the claim. Similarly, because John, too, failed to exhaust the administrative remedies available under the IDEA, the family court cannot order DOH to pay for John's services on that basis. Nevertheless, we hold that John's status as a "ward of the state" creates an independent state basis that obligates the State, generally, to pay for John's mental health services and for which the Department of Human Services (DHS), as John's co-custodian, is ultimately accountable. However, because the record is insufficient to establish that DOH had a specific legal obligation to pay for John's mental health services, we vacate the order of the family court requiring DOH to pay for John's mental health services and remand for further proceedings consistent with this opinion.

## I. *INTRODUCTION*

Before proceeding to the specific facts of each of the cases before us, we believe a brief description of the IDEA and certain of its provisions as they relate to the issue involved in this case is warranted.

The IDEA has a complex statutory and regulatory framework, the basic purpose of which is to ensure that states provide an appropriate education to children with disabilities. The IDEA was originally enacted in 1970 as the Education of the Handicapped Act, Pub.L. No. 91–230, §§ 601, 611, 84 Stat. 175, 178 (1970), substantially revised in 1975, *see* Pub.L. No. 94–142, 89 Stat. 773–96 (1975), and given its present name in 1990. Pub.L. No. 101–476, § 901(a), 104 Stat. 1141, 1142 (1990). As a condition of receiving federal funds for the special educational needs of disabled children, states are required to maintain policies and procedures that ensure all disabled children receive a free appropri-

ate public education (FAPE). *See* 20 U.S.C. § 1412(a)(1); *see also Honig v. Doe,* 484 U.S. 305, 310, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). A FAPE is defined as

special education and related services that—

(A) have been *provided* at public expense, under public supervision and direction, and *without charge;*

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and

(D) are provided in conformity with [an] individualized education program [defined in 20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(8) (emphases added). "Special education" refers to

specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including—

(A) instruction conducted in the classroom, in the home, in *hospitals and institutions, and in other settings;* and

(B) instruction in physical education.

20 U.S.C. § 1401(25) (emphasis added). "Related services" means

transportation, and such developmental, corrective, and other *supportive services (including* speech-language pathology and audiology services, *psychological services,* physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) *as may be required to assist a child with a disability to benefit from special education,* and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(22) (emphases added). Thus, as a condition of receiving federal funds, the State of Hawai'i is required to provide not only special education, but also related services, such as the psychological or mental health services at issue here, as part

of the FAPE to which children with disabilities are entitled.[4]

The primary state agency in Hawai'i responsible for ensuring that disabled children receive a FAPE is DOE. *See* 20 U.S.C. § 1412(a)(11);[5] HRS § 26–12 (Supp.2000) (DOE responsible for administration of education and public instruction). DOE is obligated under federal law to provide mental health services as part of the State's obligation under the IDEA to provide a FAPE for children with disabilities. To fulfill its obligation, DOE can delegate and has delegated to DOH the obligation to provide "related services," such as psychological services that are necessary to facilitate a FAPE. *See generally* 20 U.S.C. §§ 1412(a)(12)(A) and 1412(a)(12)(B)(i) (describing requirement for interagency agreements to provide for requisite related and special educational services).

Although a state's obligation under the IDEA extends to all disabled children, the manner in which that obligation is fulfilled changes when a child is enrolled in a private school and depends upon the circumstances under which a child enters the private school. The IDEA recognizes that there are different scenarios under which an eligible child may be placed in a private school.

If a child is placed in a private school by the child's parents, one of two scenarios apply. Where a state has made available a FAPE and the child's parents have nevertheless voluntarily placed their child in a private school, without the consent of the state agency, the state is under no obligation to pay for any particular individual child's education at the private school, or for related services needed to facilitate that education. 20 U.S.C. § 1412(a)(10)(C);[6] *see also KDM ex. rel. WJM v. Reedsport School Dist.*, 196 F.3d 1046, 1049 (9th Cir.1999); *Russman v. Board of Educ.*, 150 F.3d 219, 221–22 (2d Cir.1998); *Peter v. Wedl*, 155 F.3d 992, 998–99 (8th Cir.1998).[7] However, where the child's par-

**4.** We are aware that disputes may arise as to whether any particular mental health service is a "related service" that falls within the scope of 20 U.S.C. § 1401(22). *See, e.g., Clovis Unified School Dist. v. California Office of Admin. Hearings*, 903 F.2d 635, 645–46 (9th. Cir.1990) (student's hospitalization not a "related service" to facilitate educational needs but rather was primarily for psychiatric or medical purposes). Because neither party argues the point, and it is not essential to the disposition of this case, we will proceed with the analysis as if the disputed services fall within the scope of the statute. However, we express no opinion on this matter.

**5.** 20 U.S.C. § 1412(a)(11) states in relevant part:

**State educational agency responsible for general supervision**
 **(A) In general**
 The State educational agency is responsible for ensuring that—
 (i) the requirements of this subchapter are met; and
 (ii) all educational programs for children with disabilities in the State, including all such programs administered by any other State or local agency—
 (I) are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and
 (II) meet the educational standards of the State educational agency.
(Bold emphases in original.)

**6.** 20 U.S.C. § 1412(a)(10)(C) provides in relevant part:

**Payment for education of children enrolled in private schools without consent of or referral by the public agency**
 **(i) In general**
 Subject to subparagraph (A) [which is not applicable to this proceeding], this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.
 **(ii) Reimbursement for private school placement**
 If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, *a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.*
(Bold emphases in original; underscored emphasis added.)

**7.** A state receiving IDEA funding, however, retains an obligation to such children in private schools. The state is responsible for ensuring that all students, including students in private schools, have in place an IEP tailored to the child's particular needs. *See* 20 U.S.C.

ents have placed the child in a private facility because the parents believe that the state educational agency has failed to provide the FAPE to which the child is entitled, the state may be required to pay for the private placement. *See* 20 U.S.C. § 1412(a)(10)(C)(ii) *supra* note 6. According to the IDEA, states must provide for the opportunity to evaluate complaints regarding the provision of a FAPE, *see* 20 U.S.C. §§ 1415(a) and 1415(b)(6),[8] and the opportunity must include the possibility of conducting an "impartial due process hearing" provided for according to state law or regulations. *See* 20 U.S.C. § 1415(f)(1).[9]

Parents have the right to seek judicial review of any final administrative decision by bringing a civil action "in any State court of competent jurisdiction or in a district court of the United States[.]" 20 U.S.C. § 1415(i)(2)(A).[10] Therefore, federal law requires states to provide a process that allows parents, who feel compelled to place their children in a private school because of the state's failure to meet its obligation to provide a FAPE, to seek reimbursement for the cost of doing so. Moreover, because a FAPE also includes "related services," *see* 20 U.S.C. § 1401(a)(8), federal law requires a similar review process for claims regarding "related

§§ 1412(a)(3)(A) and 1412(a)(4). Furthermore, although no particular child receiving a private education is legally entitled to any particular educational or related service, the state is still required to expend some of its IDEA grant on services received by children in private schools. *See* 20 U.S.C. § 1412(a)(10)(A)(i)(I) (requiring that provisions be made for the participation of private school children in a state's special educational and related programs in an amount proportionate to their numbers).

8. 20 U.S.C. § 1415(a) states:

**Establishment of procedures**

Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies. Moreover, 20 U.S.C. § 1415(b) states in relevant part:

The procedures required by this section shall include—

. . . .

services," such as the psychological services at issue in these cases. As discussed *infra*, it is Children's failure to utilize this process that is dispositive of the IDEA claims in these cases.

## II. *BACKGROUND*

In this section, we review the facts of each case.

### A. *Jane*

In October 1999, Jane, then sixteen-years-old, disclosed to her psychiatrist that her father (Father) had sexually abused her. After further investigation by the Hawai'i Department of Human Services (DHS), the agency determined Jane's allegation to be credible, and, considering the allegation in combination with Jane's other difficulties described below, the agency petitioned the family court for family supervision on November 29, 1999.

The November 10, 1999 safe family home report completed by DHS depicted Jane as a girl with a history of many problematic behaviors. Jane attended ninth grade at a public school, but was two or three years "behind" in her academic advancement. She had been in trouble for "skipping" classes,

(6) an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child[.]

9. 20 U.S.C. § 1415(f)(1) states that:

Whenever a complaint has been received under subsection (b)(6) . . . of this section, the parents involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency.

10. 20 U.S.C. § 1415(i)(2)(A) states:

Any party aggrieved by the findings and decision made under subsection (f) . . . and any party aggrieved by the findings and decision under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, *which action may be brought in any State court of competent jurisdiction* or in a district court of the United States without regard to the amount in controversy.
(Emphasis added.)

had been suspended from school, and was failing all of her classes. Other past behaviors included devil worship, cutting herself, and running away. Jane also reported having been sexually assaulted by a stranger after getting into his car voluntarily.

Jane also has a history of several psychiatric diagnoses and treatments. She has been diagnosed as having a personality disorder, depressive disorder, substance abuse disorder involving methamphetamine, marijuana, and alcohol, substance-induced psychosis, and unresolved sex abuse and adoption issues. She has also received psychiatric care at Castle Medical Center (including residential and day treatment programs), Kahi Mohala, and Queen's Medical Center. She has apparently received ongoing therapy over several years from various private doctors and therapists.

At the December 6, 1999 family court hearing on DHS's petition for family supervision, Mother, who was not represented by an attorney at the hearing, spontaneously told the court that she was going to send Jane to Excelsior in Colorado. Mother explained that Jane had been to several treatment facilities in Hawai'i and that "there's nothing here for her." In response to questioning from the court, Mother indicated that Jane wanted to go to Excelsior and that "this is the first time she's wanted to go any place. And what they've offered here is not acceptable." Mother stated that the cost, which Mother planned to pay personally, was $5,500 per month and that Jane was leaving on December 28th. The DHS case worker stated that DHS did not object to Jane going to Excelsior. Thereafter, Jane's court-appointed guardian ad litem, over the objection of counsel for DHS, asked the court for a continuance of the hearing so that DOH could be brought in as a party and ordered to pay for Jane's treatment. The guardian ad litem argued that:

> The reason for that is, [Jane] is a [DOH] *Felix* child. And from the reports, it appears that they've done everything to try

to keep the child here, and it hasn't worked. At this point, if the child is going to Colorado, I believe it's up to [DOH] to pay for it.

The court granted DHS' request for family supervision and, at the same time, ordered DOH to appear at a subsequent review hearing "for purposes of discussing placement for [Jane]. . . ."

The subsequent review hearing took place on December 20, 1999. Jane's guardian ad litem presented several reasons in support of his request that DOH pay for Jane's treatment at Excelsior, including, *inter alia*, that, because Jane was a *Felix* child eligible to receive services through the DOH, DOH should pay for the treatment. In opposition, counsel for DOH argued that DOH could provide treatment for Jane in Hawai'i and that, in any event, under the IDEA, if Mother had placed Jane in a private facility because she was dissatisfied with the services Jane had received, Mother was required to follow an administrative process, described *supra* in section I, in order to obtain reimbursement from DOH. Subsequently, the following discussion between the court and a DOH representative present at the hearing,[11] relating to the availability of treatment in Hawai'i, ensued:

> THE COURT: This is the old song and dance we go through all the time together. And I have to say that, based upon what I've heard today, I don't have any problem ordering the DOH to pay for her placement at Excelsior.
>
> [DOH REPRESENTATIVE]: . . . we did apply to places that we thought were appropriate.
>
> THE COURT: . . . I've been through this so many times with the Department of Health. And I have listened to Department of Health on occasion when they have told me to take—send a child to Queen's or to send a child to another placement, after the umpteenth placement and that a child has been lost. I've lost kids, and I'm not about to lose another kid.

---

11. The transcript of the hearing describes an unidentified, at-times indiscernible, female voice conversing with the court. Considering the court's remarks in context, and taking into ac-

count the record which contains a list of those present, it appears that the unidentified voice was that of one of two representatives from DOH.

. . . .

I look at the list that you've given me, and some of those places are [sic] two or three months waiting list. We hear about that all the time.

So, under the circumstances ... I'm happy that [Mother] has had the initiative to ... take matters into her own hands.

And based upon what [the guardian ad litem] has said and [Mother], it seems certainly that we've gone through as many placements as possible here and it's now time to look at something different.

In response to DOH's argument that Mother had not exhausted administrative remedies, the court stated:

[M]y charge here is to act in the best interests of the child. And that's what I'm doing. And what would happen to this child if I had to wait for her to exhaust the months it would take to exhaust admin— administrative remedies? When I've done that in the past ... I've had children run away. I've had two girls in prostitution, two girls on ice, and both of them now [in detention] facing additional charges.

So, I don't really care about the administrative remedies under the circumstances. . . .

... The best interest of the child prevails over all. . . .

The court subsequently found that "[t]here are no adequate placements in Hawai'i for [Jane] to meet her needs" and ordered DOH to pay for Jane's treatment at Excelsior School.

DOH filed a motion for reconsideration of the order requiring it to pay the costs of Jane's treatment at Excelsior School, which was denied at the subsequent December 27, 1999 hearing. The family court entered Findings of Fact (FOF) and Conclusions of Law (COL) on March 20, 2000, among which were the following COL:

1. This court has the power to enter such orders regarding the provision of serves [sic] to [Jane] as this court deems to be appropriate and consistent with the best interests of the child. . . .

2. [Jane] is entitled to the free appropriate public education, including edu-

cational services and mental health services [Jane] may require to benefit from the education services, under the [IDEA]. . . .

3. It is in [Jane's] best interests to provide [Jane] timely education and psychological care by an appropriate program.

4. DOH is required to provide appropriate mental health services under IDEA and ... pursuant to the consent decree entered in *Felix v. [Cayetano]*.

5. DOH is required to pay for the costs of providing appropriate program to [Jane] outside of Hawai'i when as in this case, there is no appropriate program specifically for [Jane] in the State of Hawai'i.

DOH timely appealed.

### B. *John*

John was born on November 10, 1988 and taken into protective custody by DHS upon his discharge from the hospital six days after his birth. At that time, DHS placed John with Mr. and Mrs. Doe, and John has resided with the Does since then. On December 15, 1988, the family court took jurisdiction over John pursuant to HRS chapter 587, and, on November 30, 1989, awarded permanent custody of John to DHS. Subsequently, in June 1991, Mr. and Mrs. Doe entered into a "Stipulation to Co Permanent Custody[,]" wherein the Does and DHS were appointed permanent co-custodians. This arrangement was made because John was not considered adoptable or a candidate for legal guardianship due to his multiple special educational and psychological needs. One of the conditions of the stipulation was that "[DHS] will provide foster board payments, special service payments and Medicaid[.]" A report of John's guardian ad litem completed shortly before the Does entered into the agreement with DHS had recommended such an arrangement in order to provide John with a permanent family home while still ensuring that DHS would provide financial support for John's special needs.

Pursuant to John's eligibility under the

IDEA and as a *Felix* class member,[12] DOE provided John with special education services from 1993, when John entered kindergarten, until 1997, when John was in the third grade. However, the Does became discouraged with the public special education services that were provided to John and, in the fall of 1997, enrolled him in Variety School, a private school. The Does made an up-front payment of $4,000, half of the $8,000 annual tuition, in order to place John in Variety School. The DHS, as John's co-custodian, did not object to this placement; in fact, the DHS social worker sought and received permission for special DHS funds to help pay at least a portion of the tuition balance. The Does were pleased with John's progress in Variety School and believed that John was doing better there than he has been in the public school system.

In November 1998, the Does sought to require the DOE to pay costs associated with John's education at Variety School for the 1998–99 school year. The Does used the IDEA administrative process described *supra* in section I. Pursuant to this process, the Does reached an agreement with DOE in July 1999, settling all claims for the 1998–99 school year for $5,500. The agreement expressly states that "payments are not to be construed as an admission that the appropriate placement for [John] is any [place] other than the [public] placement proposed by DOE."

Beginning in 1993, John was prescribed psychotropic medication to help him concentrate in the classroom. The medication was initially helpful, but eventually had to be adjusted. From 1996 to 1998, John took several different medications, at least one of which caused John to develop unacceptable side effects, including vocal and motor tics. It was not until 1998 that John finally achieved a stable medication regimen.

Although the record does not clearly reflect when payments began, DOH had been paying for mental health services for John, which included payment for the psychiatrist who prescribed his medications. These payments apparently began when John was enrolled in the public school system and were

viewed as a part of the FAPE to which John was entitled under the IDEA. DOH continued to make these payments after John's transfer to Variety School. The record suggests that, as a "ward of the State," John would apparently also be eligible to receive services paid for through an alternative health plan, Quest. It appears that the reason DOH, rather than Quest, had been paying for John's mental health services was because Quest had determined that John was not eligible under its plan due to John's entitlement to services pursuant to the IDEA.

On April 24, 2000, two and a half years after enrolling John in Variety School, DOH notified his co-custodians, the Does, by letter that, as of June 30, 2000, John would no longer be eligible to have DOH pay for the mental health services he was receiving because the Does had voluntarily enrolled John in a private school and that he was therefore not eligible for DOH services. The potential consequences of this termination of services were noted in a June 5, 2000 permanent plan report prepared by DHS, which stated that DOH's termination of coverage would "create a problem for [John], as his medicine needs to be very carefully monitored. He is taking a great deal of medication and the dosage has to be frequently altered."

The family court conducted a routine permanent plan review hearing on June 7, 2000. Representatives of both DHS and DOH attended, and a deputy attorney general appeared on behalf of both DHS and DOH. John's guardian ad litem expressed concern about the impending cutoff of mental health services to John and the fact that John was "falling right in the center" between two agencies in terms of his eligibility for services. The deputy attorney general indicated that "the State" would pay for John's services through its Quest program and that DOH would pay for services throughout John's transition to Quest, stating that "[t]hey are not gonna cut him off so he won't be left without any kind of benefits." The court then indicated that it would place DOH's commitment to pay during the transi-

---

12. *See supra* note 3.

tion in a written order. The deputy attorney general objected, arguing that, even though the State—through Quest—would ultimately end up paying for John's services, it was improper to order DOH to pay for the services. The deputy attorney general further argued that, because the Does had not accepted the State's offer of a FAPE, but instead had placed John in a private school, DOH was not obligated to pay for John's mental health services. The court disagreed, reasoning that, because DHS was a permanent co-custodian of John, the State had a special obligation to pay for services that John received. Specifically, the court stated:

> They [13] belong to the State.... That's a State problem. These are State agencies and they will pay for whatever these children need because [the Does] out of the goodness of their hearts, they're permanent custodians. This is some kind of fiction that we created through the court system.
>
> But still, these children come under our responsibility as wards of the State. They're not adopted. They're not guardianshipped out. They still belong to the State so the State will continue to pay for their—their special needs.
>
> ....
>
> If this was [the Does'] natural child I can buy [counsel for DOH's] argument all the way but this is not their natural child. This is a State kid. They're taking money out of their own pocket to put this State kid in this private school....
>
> ....
>
> These people [the Does] have gone the extra mile and a half to provide a—a good home for these kids because of the many special needs that they have.

13. In addition to John, the Does are permanent co-custodians, with DHS, of two other children.

14. We note that the motion for reconsideration indicated that it was being filed by DOH *and* DHS; however, the declaration of counsel attached to the motion stated that the motion is being brought by DHS, on behalf of DOH, "which is not a party to the matter[.]" The latter statement conflicts with the statement of a different deputy attorney general at the June 7 hearing who stated that he was appearing on behalf of *both* DOH and DHS. It appears that any possible

The State has to come in and substitute and provide the services that they need.

Consistent with the above statements, the family court entered orders on June 7, 2000, ordering DOH to pay for mental health services not covered by Quest.

On June 19, 2000, DOH filed a motion for reconsideration of the family court's order.[14] At the July 6, 2000 hearing on the motion, the family court received into evidence a June 30, 2000 letter from Vuong Mindy, DOH Mental Health Care Coordinator, promising that DOH, "in conjunction with [DHS] and [John's] family will assure that appropriate Mental Health services" would be in place during John's transition from care provided by DOH to care provided by DHS. The family court denied DOH's motion for reconsideration, reiterating its earlier reasoning that John's status as a "ward[] of the State" created a special obligation on the State's part to pay for whatever services were in John's best interest.

On August 22, 2000, the family court filed its FOF and COL, among which were the following COL:

> 7. [The Does], along with [DHS], as co-permanent custodians of [John], are obligated to provide for [John's] special educational needs, and [John's] mental health needs....
>
> 8. Under the specific circumstances of this case, the Family Court, as part of its supervision of co-permanent custodians, in their care of [John], and of the supportive services provided to [John], has the authority to require the Department of Health to pay for [John's] mental health needs, not covered by the Quest medical plan.

claims DOH may have alluded to in the motion for reconsideration regarding the family court's personal jurisdiction over it were waived by the deputy attorney general's representation at the June 7 hearing. *See* Hawai'i Family Court Rules Rule 12(b)(2) (2000) (claims regarding lack of personal jurisdiction must be made in first responsive pleading or motion). At any rate, because DOH is the party before this court, for present purposes we shall treat the motion for reconsideration as having been brought by DOH.

9. The Individuals With Disability Act ... under the circumstances of this case, [does] not preclude the Department of Health from using its funds to provide [John] with mental health services, not covered by the Quest Medical Plan.

DOH timely appealed.

## III. *STANDARDS OF REVIEW*

### A. *Subject Matter Jurisdiction*

■ Whether a court possesses subject matter jurisdiction is a question of law reviewable *de novo.* *Casumpang v. ILWU, Local 142,* 94 Hawai'i 330, 337, 13 P.3d 1235, 1242 (2000) (citations omitted).

### B. *Conclusions of Law*

■ This court reviews the family court's legal conclusions *de novo. See In re Doe,* 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996).

### C. *Findings of Fact*

■ We review a trial court's findings of fact (FOFs) under the clearly erroneous standard. Under this standard, we will not disturb a FOF unless we are left, after examining the record, with a "definite and firm conviction that a mistake has been committed. The test on appeal is whether there was substantial evidence to support the conclusion of the trier of fact. Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Id.* (Citations, internal quotation marks, ellipses, and brackets omitted).

### D. *Family Court Decisions Regarding What Constitutes a Child's "Best Interest"*

■ The family court possesses wide discretion in making its decisions, and those decisions will not be set aside unless the court abuses its discretion. *See Doe,* 84 Hawai'i at 46, 928 P.2d at 888.

The trial court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. Stated differently, an abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*Canalez v. Bob's Appliance,* 89 Hawai'i 292, 299, 972 P.2d 295, 300, 302 (1999) (internal citations, quotations, and brackets omitted).

## IV. *DISCUSSION*

### A. *Appellate Jurisdiction*

■ A threshold issue arises regarding whether this court has appellate jurisdiction to hear these cases. In general, appeals in family court cases, as in other civil cases, may be taken only from (1) a final judgment, order, or decree, *see* HRS §§ 571–54 (1993) and 641–1(a) (1993), or (2) a certified interlocutory order. *See* HRS § 641–1(b) (1993). The family court orders in this case were not "final" in that the family court retains continuing jurisdiction over Children and their families, and no interlocutory orders were certified. Nevertheless, the orders are appealable because they meet the "requisite degree of finality of an appealable order[.]"*In re Doe,* 77 Hawai'i 109, 115, 883 P.2d 30, 36 (1994).

■ The very nature of a family court chapter 587 proceeding entails "an ongoing case which does not result in a 'final' order, as that term is generally defined[,]" *Doe,* 77 Hawai'i at 114, 883 P.2d at 35 (citing *In re N.D.,* 857 S.W.2d 835, 842 (Mo.Ct.App.1993)), because, under chapter 587, the family court retains continuing jurisdiction over the case in order to prevent future harm or threatened harm to a child. Thus, in such family court cases, we consider whether the particular order appealed from contains a sufficient "degree of finality" to establish appellate jurisdiction. For example, in *Doe,* we held that the requisite degree of finality existed to establish appellate jurisdiction to review a natural mother's appeal of a family court order awarding foster custody of her five-year-old child to DHS, despite the fact that the family court's continuing jurisdiction and supervision of the case was not "final." *Doe,* 77 Hawai'i at 110, 115, 883 P.2d at 31, 36. This court noted that the "manifest importance of the right of a parent to raise his or

her child[,]" which we analogized to a "fundamental liberty interest[,]" weighed heavily in favor of establishing appellate jurisdiction. *Id.* at 114–15, 883 P.2d at 35–36. Analogously, in *Cleveland v. Cleveland,* 57 Haw. 519, 559 P.2d 744 (1977), this court held that a family court decree granting divorce and dividing real property was final and appealable even though the family court retained jurisdiction to decide questions of custody and support of the couple's minor children. *Id.* at 523–24, 559 P.2d at 747–48. We noted that it would be "intolerable" for an unappealed divorce decree "to remain uncertain as to finality because the family court continues to retain jurisdiction of the proceeding to deal with the welfare of minor children[.]" *Id.* at 524, 559 P.2d at 748. We also noted that to deny appellate jurisdiction "could leave titles [to real property] in question for periods approaching 18 years." *Id.*

In the instant case, the family court's orders reflect the requisite degree of finality to establish appellate jurisdiction. The issue involved in the orders—who will pay for services needed to prevent future harm to Children—is sufficiently distinct from the question of Children's actual need for the services, such need establishing the rationale for the family court's continuing jurisdiction. Moreover, the interests at stake are important and require appellate resolution. DOH has a strong interest in having its obligations clarified with respect to funds associated with the IDEA and the *Felix* consent decree.[15] Furthermore, without appellate review, Children will be left with the uncertainty of whether the current mental health services they are receiving will ultimately be paid for by DOH. Such uncertainty may deter Children from obtaining necessary treatment for fear of being subject to a large bill at some unspecified future date. In short, the fact that the question of who is responsible for payment for particular services received by Children can be decided independently from the need for the family court's continuing jurisdiction, coupled with

the importance of obtaining a definitive ruling on the issue, establishes that the "requisite degree of finality" is present to permit appellate jurisdiction.

Having established that appellate jurisdiction exists, we now turn to the major issue in the case: whether the family court had authority to order DOH to pay for Children's mental health services.

### B. *The Family Court's Order Requiring DOH to Pay for Children's Services*

As previously stated, DOH essentially argues that the question whether DOH is legally obligated to pay for the mental health services provided to Children is an issue that arises under the IDEA and that, under the IDEA, the family court did not have jurisdiction to determine this issue. DOH asserts that, when parents of a disabled child voluntarily place their child in a private facility because they believe that the child is not receiving the FAPE to which their child is entitled, DOH has no obligation to pay for the child's private mental health services unless the parents can demonstrate, through the administrative process prescribed by the IDEA, that the State has failed to provide a FAPE.[16] Because Children's parents did not seek reimbursement through the established administrative process, DOH maintains that its legal obligation to pay was not established and that the family court was without authority to order DOH to make such payment. Children, on the other hand, essentially argue that the family court's authority to issue orders in their best interest to prevent harm or threatened harm is very broad and encompasses the ability to order DOH to pay for services.

To evaluate these arguments, we first delineate the boundaries of the family court's jurisdiction.

### 1. Family Court Jurisdiction Generally

The family court is a court of limited jurisdiction and, as such, derives its

---

15. This court takes judicial notice of the controversy concerning the costs associated with the State's compliance with the IDEA and the *Felix* consent decree. *See* Hawai'i Rules of Evidence Rule 201 (1993).

16. For clarification purposes, we note that Jane's case involves a dispute over the "related services" portion of a FAPE and that Excelsior also provides educational services to its residents.

authority from the statutes that created it. *See Cleveland*, 57 Haw. at 520, 559 P.2d at 746; *In re Doe*, 86 Hawai'i 517, 520, 950 P.2d 701, 704 (App.1997). The family court's jurisdiction is defined by HRS § 571–11 (1993), which states in relevant part:

> Except as otherwise provided in this chapter, the court shall have exclusive original jurisdiction in proceedings:
>
> . . . .
>
> (9) For the *protection of any child under chapter 587* [the Child Protective Act].

(Emphasis added). Thus, jurisdiction in chapter 587 cases is conferred upon the family court pursuant to HRS § 571–11(9). As HRS § 587–11 explains:

> Pursuant to [section] 571–11(9), the [family] court shall have exclusive original jurisdiction in a child protective proceeding concerning any child who was or is found within the State at the time the facts and circumstances occurred, are discovered, or are reported to [DHS], which facts and circumstances constitute the basis for the finding that the child *is a child whose physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm* by the acts or omissions of the child's family.

(Emphasis added.) (Some brackets in original.) Therefore, the primary focus of the court's jurisdiction in such cases is to prevent harm to the child.[17]

In addition, the family court in both cases was conducting a review hearing, a proceeding which the court is required to schedule, at a minimum, on a semi-annual basis to review the service plan of a child who has come under its jurisdiction. *See* HRS § 587–72(a). HRS § 578–72(c) outlines the responsibilities and authority of the family court in such review proceedings. In relevant part, HRS § 587–72(c) states:

> Upon each review hearing the court shall consider fully all relevant prior and current information pertaining to the safe family home guidelines . . . and
>
> . . . .
>
> (6) *Enter further orders as the court deems to be in the best interests of the child* [.]

(Emphasis added.) Thus, in the context of a review proceeding, the family court has authority to issue orders in the best interests of the child that are necessary to fulfill the purposes of the Child Protective Act.

 As Children point out, the purposes of the Child Protective Act should be broadly construed. In defining the purposes of the Act, HRS § 587–1 (Supp.2000) states in relevant part:

> This chapter creates within the jurisdiction of the family court a child protective act to make paramount the safety and health of children who have been harmed

---

17. In support of her argument that the family court has extremely broad jurisdiction extending to the ability to order DOH to pay for treatment at Excelsior, Jane cites to HRS § 571–11(2), which authorizes the family court to take jurisdiction of a case where a minor is "neglected as to or deprived of educational services[.]" Jane points out that, even though she originally came to the attention of the family court under HRS § 571–11(9), the family court has authority to issue orders on her behalf concerning the provision of educational services because, once the family court assumes jurisdiction under one statutory provision, it may invoke powers pursuant to other jurisdictional provisions as well. *Cf. Doe*, 84 Hawai'i at 52, 928 P.2d at 894 ("Simply because an action is initiated as a chapter 571 proceeding should not preclude or limit the family court from addressing problems perceived as arising under chapter 587.").

HRS § 571–11, however, only specifies the *circumstances* under which the family court may assume jurisdiction over a minor or the minor's family; in contrast, the *powers* available to the family court, once the court obtains jurisdiction, are specified in the relevant statutory provisions. The primary powers available to the family court obtaining jurisdiction under HRS § 571–11(2) involve the court's ability to take a child into custody and place a child at home, in a shelter, in detention, or require participation in other community activities. *See, e.g.*, HRS §§ 571–31 to 571–33 (1993) & 571–41 (1993 & Supp.2000). These powers do not involve ordering an agency to pay for educational services. At any rate, once the family court obtains jurisdiction under the Child Protective Act, as will be discussed *infra*, the court's powers are very broad and arguably encompass any of the powers available to it under HRS § 571–11(2). Thus, we need not consider further the question whether the family court also obtained jurisdiction of Jane's case under HRS § 571–11(2).

or are in life circumstances that threaten harm. Furthermore, this chapter makes provisions for the service, treatment, and permanent plans for these children and their families.

. . . .

This chapter *shall be liberally construed* to serve the best interests of the children and the purposes set out in this chapter. (Emphasis added.) Thus, this court gives deference to decisions of the family court made pursuant to its chapter 587 authority to issue orders that are in the best interests of a child to prevent harm or threatened harm.

■■■ However, the family court's jurisdiction is not so broad that it extends to the ability to simply order anyone to pay for needed services. Obviously, there must be a legal basis establishing an obligation to pay. In particular, HRS § 587-76 (1993) provides in relevant part:

Whenever a service or treatment is provided to a party, or whenever care, support, or treatment of a child is provided under this chapter, after due notice to the *persons or legal entities legally obligated to pay* for such service, treatment, care, or support of the child, and after a hearing, *the court may order that such a legally obligated person shall pay,* in such a manner as the court may direct, a reasonable sum that will cover in whole or in part the cost of the service or treatment provided to a party, or the cost of the care, support, or treatment provided for the child.

(Emphases added.) Therefore, the family court has jurisdiction to order persons or entities to pay for necessary services in order to protect the health and safety of a child in danger of harm *when such person or entity is legally obligated to do so.*

Consequently, the dispositive question is whether DOH is legally obligated to pay for Children's services. If so, the family court's decision to order payment for such services is entitled to deference. If, however, it is determined that DOH was not legally obligated to pay for the services, then the family

court was without jurisdiction to order DOH to do so.[18]

It is at this point that Children's arguments diverge somewhat. The only source of DOH's obligation to pay for Jane's services that was argued, at trial or on appeal, was the IDEA; this is also reflected in the family court's COL specifically stating that the source of DOH's legal obligation to Jane was the IDEA. *See supra* COL Nos. 2 & 4 at 16. John's position, in contrast, appeared to be that DOH should pay for John's services on account of both the IDEA and John's status as a "ward of the state," thereby suggesting that an independent state law basis may exist for the family court's orders with respect to him. Indeed, the family court's orders in John's case appear to be premised on an independent state law basis. *See supra* COL nos. 7, 8, & 9 at 22 (describing the "specific circumstances of this case" and the fact that the IDEA "does not preclude" DOH from paying for John's services). Therefore, we next review whether, under the IDEA, the family court has jurisdiction to determine DOH's legal obligation to pay for Children's services.

### 2. Determination of Legal Obligation to Pay for Services under the IDEA

As previously indicated, under the IDEA, states are required to establish procedures to evaluate complaints regarding the provision of a FAPE. 20 U.S.C. §§ 1415(a) and 1415(b)(6). The procedure must involve an "impartial due process hearing" provided for according to state law or regulations. 20 U.S.C. § 1415(f)(1). Parents have the right to seek judicial review of any final administrative decision by bringing a civil action "in any State court of competent jurisdiction or in a district court of the United States[.]" 20 U.S.C. § 1415(i)(2)(A); *see supra* note 10. Therefore, federal law requires states to provide a process that allows parents, who feel compelled to place their children in a private school because of the state's failure to meet its obligation to provide a FAPE, to seek

---

**18.** Children appear to argue that the family court's broad authority under HRS chapter 587 to issue orders in their best interest can itself create DOH's legal obligation to pay for the services they received. We disagree because this

formulation of family court jurisdiction lacks any reasonable mooring. If the "best interest" language of HRS § 587-72(c)(6) conferred the ability to create a legal obligation, HRS § 587-76 would be superfluous.

reimbursement for the cost of doing so. Moreover, because a FAPE also includes "related services," *see* 20 U.S.C. § 1401(8), federal law requires a similar review process for claims regarding "related services" such as the psychological services at issue in these cases.

■■■■■■ Hawai'i has established the required review process for complaints related to FAPE through a statutory and regulatory scheme. HRS § 302A–443(a) (Supp.2000) provides in part that:

> An impartial hearing may be requested by any parent or guardian of a handicapped child, or by [DOE], on any matter relating to the identification, evaluation, program, or placement of a handicapped child. [DOE] shall adopt rules that conform to the requirements of any applicable federal statutes or regulations pertaining to the impartial hearing based on the education of a handicapped child.

Pursuant to the statute, Title 8 of the Hawai'i Administrative Rules (HAR) allows for a hearing to assess complaints regarding the provision of a FAPE. HAR § 8–56–51(b) (2000) provides that "[d]isagreements between a parent and the [DOE] regarding the availability of a program appropriate for the student, and the question of financial responsibility, are subject to the due process procedures of sections 8–56–64 to 8–56–81." These latter rules describe in detail the hear-

ing and notice procedures, rights of the parties, and communication of hearing results. *See generally* HAR § 8–56 (2000).[19] HAR § 8–56–78, like the federal law, provides that "any party" aggrieved by the results of the due process hearing may bring a civil action "in any state court of competent jurisdiction" or in federal district court. Thus, Hawai'i law provides for the administrative review process mandated by federal law to address claims related to payment for services when parents place their child in a private school because a FAPE is at issue. Exhaustion of this administrative process is mandatory prior to seeking judicial review. *See Kona Old Hawaiian Trails Group v. Lyman*, 69 Haw. 81, 93, 734 P.2d 161, 169 (1987) ("Judicial review of agency action will not be available unless the party affected has taken advantage of all the corrective procedures provided for in the administrative process." (Citations and internal quotation marks omitted.)); *see also Honig v. Doe*, 484 U.S. 305, 326–27, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (noting the IDEA's exhaustion requirement).[20]

■■■■ In this case, it is undisputed that Children's parents voluntarily enrolled Children in private schools and did not seek payment for the services at issue through the administrative remedies that are available to them.[21] Therefore, the family court cannot determine DOH's legal obligation to pay for the disputed services because administrative remedies have not been exhausted. Accord-

19. HAR § 8–36 (1999), and not section 8–56, was in effect at the time of the family court's decision in Jane's case. Section 8–36 was superseded on March 16, 2000 by the rules currently in effect, which applied in John's case. Although the rules in section 8–36 'are less detailed than the present rules in section 8–56, sections 8–36–16 through 8–36–18 provided for the opportunity for an impartial hearing, *see* HAR § 8–36–16, described the rights of involved parties in such a hearing, *see* HAR § 8–36–17, described the manner of communicating the hearing examiner's decision, *see* HAR § 8–36–17, and provided for a right to appeal the decision of the hearing examiner "in state court." *See* HAR § 8–36–18(c).

20. At oral argument, Jane also maintained that seeking reimbursement through the administrative process would be futile because of the length of time it would take before she could be reimbursed. Ordinarily, futility refers to the inability of an administrative process to provide the ap-

propriate relief, *see, e.g., Hokama v. University of Hawai'i*, 92 Hawai'i 268, 273, 990 P.2d 1150, 1155 (1999) ("[a]n aggrieved party need not exhaust administrative remedies where no effective remedies exist[]"), and the burden of proving that any particular administrative remedy is futile rests with the litigant seeking to bypass it. *See Honig*, 484 U.S. at 327, 108 S.Ct. 592. Thus, Jane must show that the length of time it would take to proceed through the administrative process effectively precludes her from utilizing the process. However, Jane points to nothing that would prevent her from seeking reimbursement for her stay at Excelsior through the administrative procedures presently in effect in HAR § 8–56.

21. Although the Does participated in DOE's administrative review process in November 1998, that proceeding concerned John's special educational services, not the related services at issue here and involved a different time period.

ingly, the family court's order with respect to Jane must be vacated and remanded for dismissal of Jane's claim due to lack of jurisdiction. However, the inquiry with respect to John does not end here. We now proceed to determine whether, as John maintains, there is an independent state-law basis authorizing the family court to order payment for John's services.

### 3. *Determination Whether There is an Independent State-law Basis for the Family Court to Order DOH to Pay for John's Mental Health Services*

■ As permanent co-custodians of John, DHS and the Does are required, among other things, to "assure that [John] is provided in a timely manner with adequate food, clothing, shelter, psychological care, physical care, medical care, supervision, and other necessities[.]" HRS § 587-2 (1993). Moreover, an important impetus behind the co-custodial arrangement was to ensure that the State, through DHS, continued to provide financial support for John. *See supra* at 280, 30 P.3d at 886. Without this arrangement, willing families such as the Does would be unable to take "special needs" children into their homes, children such as John may not have the opportunity to grow up in a healthy family environment, and the State would undoubtedly incur increased financial costs as it sought to provide alternative living arrangements.

Under these circumstances, we hold that the family court correctly concluded that an independent state basis exists under which John is entitled to receive payment for the mental health services regardless of whether he is eligible to receive payment pursuant to the IDEA. In its COL No. 7, which states that the Does, "along with [DHS], as co-permanent custodians of [John], are obligated to provide for [John's] special educational needs, and [John's] mental health needs[,]" the family court identified *DHS*—John's co-custodian—as the state agency legally responsible for John's welfare. Consequently, the family court's order requiring *DOH* to pay for the services, in the absence of a basis in the record for establishing DOH's specific legal obligation, unnecessarily infringes upon the prerogative of state executive agencies to determine the appropriate means by which DHS's obligation to John is to be fulfilled. For example, it may well be that, as the executive agency ultimately responsible for John, DHS would pay for the services directly. Alternatively, it may be appropriate that, based upon administrative guidelines establishing John's eligibility to receive services provided by a particular program administered by DOH, DHS would arrange to have DOH pay for or provide John's mental health services.

■ For this court to make a decision as to which state agency or program must pay for the particular services at issue on the basis of the incomplete record before us would unnecessarily infringe upon the prerogative of executive agencies to establish and maintain programs that fulfill their respective responsibilities. Further, it may result in the inappropriate diversion of resources from one program when another is better suited to attend to John's needs. We believe that DHS, as the executive agency legally responsible for fulfilling the State's obligation to John, should have primary responsibility for these decisions.

The family court's role is to prevent harm to John by ensuring that his custodians act in his best interest and by issuing appropriate orders, including ordering an entity to pay for services when it has an obligation to do so. *See* HRS § 587-76. Therefore, we vacate the family court order requiring DOH to pay for John's services because the record does not establish DOH's obligation to pay for the services.

■ In its ongoing supervision of John's case, the family court may ascertain from DHS how it will ensure that the state-based obligation to provide for John's mental health services will be fulfilled. If DHS is unable to articulate the means by which the State's executive agencies will fulfill its obligation to John, the family court may, consistent with the holding in this case and with the family court's duty to protect John, order DHS to pay for John's services. *Cf. In re Doe*, 74 Haw. 409, 412, 849 P.2d 55, 57 (1993) (stating that "it is specious to argue that the DHS can control the court's jurisdiction over certain matters by simply rearranging its

budget to avoid statutorily imposed responsibilities to care for foster children"). Moreover, because the family court's approval of the service plan constitutes a determination that the mental health services at issue are needed, and neither party has disputed this determination, we emphasize that the family court's decision regarding the need for the particular services at issue cannot be disturbed. Furthermore, because the family court's approval of the service plan incorporating John's attendance at Variety School impliedly determines that such attendance is in his best interest, it follows that DHS may not fulfill its obligation to meet John's mental health needs by enrolling him in a state program that effectively requires John to be removed from Variety School in order to be eligible to receive the benefits of the state program.[22]

### IV. CONCLUSION

Based on the foregoing, we hold that the family court lacked jurisdiction to order DOH to pay for Children's services at issue in these cases because DOH's legal obligation to pay for the services under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq., had not been established through the administrative process mandated by 20 U.S.C. § 1415(f)(1), HRS § 302A–443(a), and HAR §§ 8–36 or 8–56, or by judicial review of any resulting administrative decision pursuant to 20 U.S.C. § 1415(i)(2)(A) or HRS § 91–14(b). Accordingly, we vacate the family court's order in Jane's case and remand for dismissal of her claim. In John's case, we affirm the family court's conclusions of law to the extent that they establish an independent state-based

obligation to pay for the services John received and that DHS is the executive agency responsible for ensuring that this obligation is met. Accordingly, we vacate the order of the family court requiring DOH to pay for John's mental health services and remand for further proceedings consistent with this opinion.

---

22. We also reject DOH's contention that the family court's order violates article X, section 1 of the Hawai'i Constitution, which states in relevant part that public funds shall not "be appropriated for the support or benefit of any sectarian or private educational institution." DOH's argument is premised on the relationship between John's enrollment in a private school and the impact that his enrollment has upon the State's obligation under the IDEA to provide a FAPE. However, we discern no particular constitutional concerns when the State's obligation to pay for John's services is based on the rather ordinary proposition that the State is ultimately obligated to care for a person who is a "ward of the state."

DOH also argues that: (1) John's guardian ad litem cannot raise a claim under the IDEA because the ability to raise a claim under the IDEA is limited to parents of the disabled child, see 20 U.S.C. § 1415(f)(1) supra note 9 (referring to the right of the child's "parents" to request a due process hearing); and (2) the Felix consent decree grants the federal district court exclusive jurisdiction over the question whether DOH is obligated to pay for Children's services. These arguments are not material given our disposition of this case on state grounds.