65 P.3d 167

**In the Interest of Jane DOE, Born on June 16, 1994, a minor.**

No. 24923.

Supreme Court of Hawai'i.

March 20, 2003.

As Amended April 22, 2003.

John Y.U. Choi, deputy attorney general, on the briefs, for the appellant Department of Human services.

Tae Won Kim, for the appellee guardian ad litem for the minor child.

1. On October 30, 2001, the family court appointed Tae Won Kim as Jane Doe's guardian ad litem.

2. HRS § 587-71 provides in relevant part:
 **Disposition hearing.** (a) The court may consider the evidence which is relevant to disposition which is in the best interest of the child; provided that the court shall determine initially whether the child's family home is a safe family home. The court shall consider fully all relevant prior and current information pertaining to the safe family home guidelines, as set forth in section 587-40, in rendering such a determination.
 . . . .
 (c) If the court determines that the child's family home is a safe family home with the

MOON, C.J., LEVINSON, NAKAYAMA, and ACOBA, JJ., and Circuit Judge CRANDALL, assigned by reason of vacancy.

Opinion of the Court by LEVINSON, J.

The appellant Department of Human Services (DHS) appeals from: (1) the order of the district family court of the first circuit, the Honorable John C. Bryant presiding, filed on December 6, 2001, (a) granting the appellee guardian ad litem's (GAL's)[1] motion for immediate review, filed on November 29, 2001, (b) granting DHS's oral motion for foster custody of Jane Doe (Jane), (c) ordering that, except upon a showing of imminent physical harm, Jane not be removed from her current placement without a court order, and (d) ordering that DHS render foster care board payments to Jane's maternal aunt (Aunt); and (2) the family court's order, the Honorable John C. Bryant also presiding, filed on January 10, 2002, denying DHS's motion to reconsider, alter, or amend the order issued on December 6, 2001 or, in the alternative, for a stay of the order pending an evidentiary hearing [hereinafter, "the motion for reconsideration"].

· On appeal, DHS contends (1) that the family court exceeded its statutory authority under Hawaii Revised Statutes (HRS) § 587-71 (Supp.2002)[2] by awarding foster custody of Jane to DHS but simultaneously prohibiting DHS from exercising its statutory placement authority as a foster custodian and (2) that the family court exceeded its statutory authority by ordering DHS to make foster care

assistance of a service plan, the court shall place the child and the child's family members who are parties under the family supervision of an authorized agency, return the child to the child's family home, and enter further orders, including but not limited to restrictions upon the rights and duties of the authorized agency, as the court deems to be in the best interests of the child.
 (d) If the court determines that the child's family home is not a safe family home, even with the assistance of a service plan, the court shall vest foster custody of the child in an authorized agency *and enter such further orders as the court deems to be in the best interests of the child. ...*
(Emphasis added.)

board payments to Aunt, an unlicensed caretaker.

We agree with DHS that the family court exceeded its statutory authority under HRS § 587–71 by ordering DHS to place Jane in an unlicensed foster family boarding home and render foster care board payments to Aunt. Accordingly, we vacate the family court's orders, filed on December 6, 2001 and January 10, 2002, and remand this matter for further proceedings consistent with this opinion.

## I. *BACKGROUND*

The present matter involves the foster custody of Jane, Mother's seven-year-old daughter. On July 7, 2001, DHS received a report from Mother, alleging that Jane had been sexually abused by her father. On August 2, 2001, DHS interviewed Jane and her six-year-old brother (Brother), at which time Jane confirmed the allegation of sexual abuse by her father; Brother also disclosed that Jane had touched his penis with her hands while they were sleeping together in the same bed. On August 9, 2001, DHS interviewed Mother at Mona Lisa Santos's residence, where Mother and her children occasionally resided.[3] Mother requested that DHS place Jane in a foster home due to her uncontrollable behavior—*i.e.*, Jane's aggression toward Brother, dishonesty, and general disobedience. Upon DHS's recommendation that Mother place Jane with a relative-caretaker, Mother arranged for Jane to reside with her paternal grandparents and assured DHS that she would seek counseling for Jane and herself to improve their mother-daughter relationship. On August 11, 2001, Jane began to live with her grandparents but soon returned on August 13, 2001, per Mother's request, after Jane's grandfather refused to permit Jane to attend psychological counseling.

In September 2001, Mother again requested that DHS locate a therapeutic foster home for Jane because she could no longer "handle [Jane's] behaviors." On October 23, 2001, DHS filed a petition for family supervision,[4] pursuant to HRS §§ 571–11(9) (1993),[5] 587–11 (1993),[6] and 587–2 (1993).[7] The petition alleged, *inter alia,* (1) that Jane had been sexually abused by her father, (2) that Jane had sexually abused Brother, and (3) that there was a substantial threat of harm to Jane and Brother due to domestic violence between Mother and Santos. The family court conducted a hearing on the matter on

3. Mother apparently did not maintain her own residence. The record reveals that Mother either resided with Santos, her partner, or her uncle, who both lived in the same apartment complex.

4. It is unclear from the record why DHS initially pursued family supervision for Jane, rather than the foster custody that Mother had requested. During the hearing on the GAL's motion for immediate review, DHS stated that, in hindsight, it should have pursued the latter.

5. HRS § 571–11(9) provides that "[e]xcept as otherwise provided in this chapter, the court shall have exclusive original jurisdiction in proceedings ... [f]or the protection of any child under chapter 587."

6. HRS § 587–11 provides that:
 **Jurisdiction.** Pursuant to [section] 571–11(9), the court shall have exclusive original jurisdiction in a child protective proceeding concerning any child who was or is found within the State at the time the facts and circumstances occurred[] are discovered[] or are reported to the department, which facts and circumstances constitute the basis for the finding that the child is a child whose physical

or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm by the acts or omissions of the child's family.
(Some brackets added and some in original.)

7. HRS § 587–2 defines "family supervision" in relevant part as follows:
 "Family supervision" means the legal status created pursuant to this section, section 587–21(b)(2), or by an order of court after the court has determined that the child is presently in the legal or permanent custody of a family which is willing and able, with the assistance of a service plan, to provide the child with a safe family home. Family supervision vests in an authorized agency the following duties and rights, subject to such restriction as the court deems to be in the best interests of the child:
 (1) To monitor and supervise the child and the child's family members who are parties, including, but not limited to, reasonable access to each of the family members who are parties, and into the child's family home; and
 (2) To have authority to place the child in foster care and thereby automatically assume temporary foster custody or foster custody of the child....

October 29, 2001, at which time the family court took jurisdiction over Jane's case but continued the hearing to November 2, 2001, after Mother and Santos failed to appear in court as scheduled. On November 2, 2001, the family court granted DHS's request for family supervision of Jane, pursuant to DHS's October 9, 2001 service plan.

Meanwhile, on or about October 29, 2001, Mother, upon the advice of Jane's maternal grandmother, unilaterally placed Jane with Aunt. Thereafter, Sammiedean Sutton, the DHS social worker assigned to Jane's case, assisted Aunt in completing an application for a foster family boarding home license in order to provide foster care for Jane. During the ensuing certification process, Sutton discovered that Aunt had a prior history with Child Protective Services (CPS) and that her parental rights to three of her own children had been terminated pursuant to an HRS chapter 587 proceeding; DHS therefore denied Aunt's application for a foster family boarding home license. DHS subsequently notified the GAL of its plan to remove Jane from Aunt's unlicensed home and place Jane in a non-relative, licensed foster home as required by HRS § 346–17 (Supp.2002).[8]

On November 29, 2001, the GAL filed a motion for immediate review, requesting an order overriding DHS's decision to remove Jane from Aunt's home; the GAL's motion for immediate review, however, did not request that DHS render foster care board payments to Aunt. The family court conducted a hearing on the matter on December 6, 2001, at which Mother testified that she no longer wanted Jane to reside with Aunt because there was "too much family conflict" and that she preferred that Jane be placed in a non-relative foster home. Mother also accused Aunt of "spreading rumors" and vowing to prevent the reunification of Mother with Jane.

Jane's therapist, Judith Rocap, who testified on the GAL's behalf, opined, based on approximately ten meetings with Jane and Aunt, that Jane "ha[d] improved greatly" since she had relocated to her Aunt's residence; Jane appeared well-mannered and regularly attended school and church. Rocap further opined that Aunt's home was a "stable and caring environment" and that it would be detrimental to Jane to uproot her from Aunt's home and place her with strangers. Rocap believed, notwithstanding that foster care placement could generally be detrimental to children, that removing Jane from Aunt's home was particularly risky, given the allegations of sexual abuse of Jane by her father and, possibly, her paternal grandfather.

Aunt, who also testified on the GAL's behalf, acknowledged that she had a prior history with CPS and that, in 1997, her parental rights had been terminated as to three of her children.[9] Aunt explained that her children had been removed from her home because her ex-boyfriend had been abusive toward them. Aunt testified that she had since remarried and successfully completed parenting classes, domestic violence classes, and relationship counseling. In 2001, Aunt gave

---

8. HRS § 346–17 provides in relevant part:

> **Child placing organizations, child caring institutions, and foster boarding homes; authority over, investigation of, and standards for.** (a) No child placing organization shall engage in the investigation, placement, and supervision of minor children in foster care unless it meets the standards of conditions, management, and competence set by the department of human services.
> . . . .
> (c) No foster boarding home shall receive for care and maintenance any child unless:
> (1) It meets with the standards of conditions, management, and competence set by the department[.]
> . . . .

> (d) The department shall adopt rules pursuant to chapter 91 relating to:
> (1) Standards for the organization and administration of child placing organizations;
> (2) Standards of conditions, management, and competence for the care and training of minor children in child caring institutions and foster boarding homes; and
> (3) Standards of conditions and competence of operation of foster boarding homes as may be necessary to protect the welfare of children.
> (e) All rules of the department shall have the force and effect of law, and any violation thereof or of this section shall be punishable by a fine of not more than $200. . . .

9. Aunt's three older sons were adopted by their great-great aunt.

birth to her fifth child,[10] with whom CPS was not involved. Aunt admitted that she and Mother had a tumultuous relationship; Aunt maintained that she had attempted to help Mother (presumably, in terminating her relationship with Santos) but that Mother had declined her offer. Aunt, however, denied that she had exposed Jane to verbal altercations with Mother over the telephone. Aunt testified that Jane was adjusting well to her new home and that she was performing well in school.

During argument before the family court, DHS took the position that, given Aunt's prior history with CPS and her inability to become a licensed foster-care provider, it would be in Jane's best interest to remove her from Aunt's home sooner rather than later. Mother reiterated that her difficult relationship with Aunt would likely inhibit her reunification with Jane and that a non-relative foster home would enable Mother and Jane to improve their relationship without the intrusion of family conflict. By contrast, the GAL argued that Mother's disgruntled relationship with Aunt was not a compelling reason to remove Jane from Aunt's home; the GAL urged the family court to consider, in rendering its decision, Rocap's opinion that Aunt's home was a stable and caring environment. Thereafter, the family court ruled as follows:

> [The Court]: I'm going to adopt the agreement of the parties as to foster custody, and the award of foster custody to the department is confirmed.

> The motion for immediate review is granted. DHS is to keep [Jane] in the home of [Aunt] and not to remove [her] . . . unless there's an immediate risk of physical harm[11] . . . . [I]f there's an immediate risk of physical harm, you don't need a court order. Otherwise, you do.

> . . . .

It is not acceptable that we . . . remove [Jane] and unnecessarily subject her to the routine psychological damage that every child experiences when moved from one foster home to another. There are no current safety or neglect issues in the [Aunt's] home. And I think CPS has confirmed that itself by allowing [Aunt] to keep her newborn child in the home.

> . . . .

Kids suffer tremendous harm when they have to be moved out of homes. You took . . . your daughter out of the family that she knew because you couldn't handle her. How do you think she felt about that? Okay. And now you're asking me to remove her from another family member because you can't get along with her? Is that in [Jane's] best interest or is that in your best interest? I don't think it's in [Jane's] best interest.

> Now, . . . I'm ordering the department to pay foster board payments.

> . . . .

> Even though you say that you can't special license [Aunt's] home.

> [DHS]: Just a record objection, Your Honor.

On December 26, 2001, DHS filed its motion for reconsideration, wherein it argued that, pursuant to HRS § 346-17, see supra note 8, it could not license Aunt's home as a foster family boarding home as matter of law, due to Aunt's prior CPS history and the termination of her parental rights as to three of her children. DHS alleged that the family court, in rendering its December 6, 2001 order, in effect "assumed foster custody of the child by displacing the placement authority of DHS as foster custodian." Moreover, DHS asserted that it was not in Jane's best interests to reside in an unlicensed foster home. DHS further contended that it was unable to render foster care board payments to Aunt, as ordered by the family court,

---

**10.** In 1999, Aunt gave birth to her fourth son, who now resides with his father and paternal grandparents. Aunt testified that, after CPS became involved with her fourth child, she relinquished custody of her son and sent him to Samoa "to have the culture and the language."

**11.** Pursuant to HRS § 587-2 (1993), " '[i]mminent harm' means that there exists reasonable cause to believe that harm to the child will occur or reoccur within the next ninety days with due consideration being given to the age of the child and to the safe family home guidelines, as set forth in section 587-25."

inasmuch as (1) Aunt was not a licensed foster-care provider and (2) Aunt could not be licensed in the future due to her unresolved parenting and safety issues.

On January 10, 2002, the family court denied DHS's motion for reconsideration and ordered that all prior and consistent orders remain in full force and effect.[12] Specifically, the following colloquy transpired:

[The Court]: All right, I'm going to do the following.... I appreciate [DHS's] arguments as to the best interest of [Jane]. But the therapist, Judith Rocap, belies your concerns to a great extent. Everything that she writes ... indicates to me that [Jane] is doing well with [Aunt] and [Uncle] and that they are ... providing her with a safe family home.

Therefore, I'm going to deny your motion for reconsideration.

I am not going to ... order that the department license [Aunt].

I am going to require that you make foster board payments over your objection. Those are to commence, if not immediately, then as soon as possible.

. . . .

[DHS]: But the policy is that we cannot pay an unlicensed foster home.

[The Court]: I'm ordering you to do that over your objections.

. . . .

Under [HRS § ] 571–8.5,[13] I have broad authority to issue orders in the aid of my original jurisdiction. And I have the authority to order persons or entities to perform in the best interest of the kids. And the best interest of [Jane], as I have determined, is that she not undergo an unnecessary move from a safe, loving family home into a ... non-relative placement....

If I cannot order ... departments or people to act in the children's best interest, then the Court is essentially a rubber stamp for the department. And I refuse to do that.

[DHS]: With all due respect, Judge, that part of it's fine. It's just the paying of the monies to an unlicensed foster home. Then the Court[,] in light of the separation of [ ] powers[,] gets into the province of the discretionary function of the executive branch and the legislative branch, which is basically[ ] their call to spend the monies.

. . . .

[The Court]:.... I understand your objection.

On April 5, 2002, the family court issued its findings of fact (FOFs) and conclusions of law (COLs). In particular, the family court found that,

[a]t the hearing on January 10, 2002, DHS reasserted their position that they cannot license the maternal aunt due to her past CPS involvement, therefore, [Jane] must be removed, and that DHS has the placement responsibility based on the court awarding foster custody of the child. DHS offered no reason, compelling or otherwise, to support the removal of [Jane] from her current home, where she had been placed for almost four months. DHS did not represent that it was not in [Jane's] best interest to remain with her maternal aunt.

The family court further found that "[f]oster board payments from DHS to [Aunt] [were] essential to maintain the placement of [Jane]." Based on the foregoing findings, the family court concluded that "[t]here [were] no justifiable or compelling reasons offered by the DHS in requesting removal of [Jane] from her current foster home," and that "[Aunt's] home provide[d] [Jane] with a caring and stable environment and there [were] no safety or other compelling reasons to uproot her from the current foster home. This would constitute an unnecessary move of [Jane] and may cause serious attachment problems."

On February 8, 2002, DHS filed a timely

---

12. On January 2, 2002, the family court continued the hearing on DHS's motion for reconsideration after Mother and Santos failed to appear as scheduled; the family court also issued a bench warrant for Mother's arrest.

13. HRS § 571–8.5(a)(3) (Supp.2002) provides that "[t]he district family judges may ... [m]ake and issue all orders and writs necessary or appropriate in aid of their original jurisdiction[.]"

notice of appeal.[14]

## II. *STANDARDS OF REVIEW*

### A. *Family Court Decisions*

 Generally, the "family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." *In re Jane Doe, Born on May 22, 1976*, 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996) (quoting *In re Jane Doe, Born on February 22, 1987*, 77 Hawai'i 109, 115, 883 P.2d 30, 36 (1994)) (internal quotation marks and citation omitted). Thus, we will not disturb the family court's decisions on appeal "unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant ... [and its] decision clearly exceed[ed] the bounds of reason." *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (quoting *Doe*, 77 Hawai'i at 115, 883 P.2d at 36) (internal quotation marks and citation omitted, brackets in original).

*In re Jane Doe, Born on June 20, 1995*, 95 Hawai'i 183, 189–90, 20 P.3d 616, 622–23 (2001).

### B. *Family Court's FOFs And COLs*

 The family court's FOFs are reviewed on appeal under the "clearly erroneous" standard. *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (citing *State v. Naeole*, 80 Hawai'i 419, 423 n. 6, 910 P.2d 732, 736 n. 6 (1996)). A FOF "is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left

with a definite and firm conviction that a mistake has been made." *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citation omitted). " 'Substantial evidence' ... is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (quoting *State v. Wallace*, 80 Hawai'i 382, 391–92, 910 P.2d 695, 704–05 (1996)); *see also State v. Kotis*, 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999).

On the other hand, the family court's COLs are reviewed on appeal *de novo*, under the right/wrong standard. *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (citation omitted); *see also Leslie v. Estate of Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999). COLs, consequently, are "not binding upon an appellate court and [are] freely reviewable for [their] correctness." *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (quoting *Wallace*, 80 Hawai'i at 391, 910 P.2d at 704).

*In re Jane Doe*, 95 Hawai'i at 190, 20 P.3d at 623.

 "Moreover, the family court 'is given much leeway in its examination of the reports concerning [a child's] care, custody[,] and welfare, and its conclusions [in this regard], if supported by the record and not clearly erroneous, must stand on appeal.' " *Id.* (citations omitted).

### C. *Statutory Interpretation*

 "[T]he interpretation of a statute ... is a question of law reviewable *de novo*." ... *State v. Arceo*, 84

---

**14.** The GAL argues in his answering brief that this court lacks jurisdiction over DHS's appeal because DHS failed to file a timely motion for reconsideration pursuant to HRS § 571–54 (Supp.2002), which requires that a motion for reconsideration be filed within twenty days from the date of the entry of any such order or decree by which a party is directly affected. The GAL contends that DHS filed its motion for reconsideration twenty-two days after the family court issued its December 6, 2001 order granting the GAL's motion for immediate review and was, therefore, untimely. The GAL's argument is without merit. Although the family court file-stamped DHS's motion for reconsideration on December 28, 2001, the record reveals that DHS

timely lodged the motion with the family court on December 26, 2001, as evidenced by the clerk's acceptance and date stamping of the motion as "received," which constitutes a "filing" for purposes of Hawai'i Family Court Rules (HFCR) Rule 59(e) and HRS § 571–54. *See Doe v. Doe*, 98 Hawai'i 144, 151, 44 P.3d 1085, 1092 (2002) ("Mother's submission of her motion to a circuit court clerk on June 1, 2000, and the clerk's acceptance and date stamping of it as "RECEIVED," was a filing that satisfied the jurisdictional requirements of HFCR Rule 59(a) and (e)."). Thus, inasmuch as the family court had jurisdiction to deny DHS's motion for reconsideration, this court has jurisdiction over DHS's appeal.

Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara*, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied*, 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata*, 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied*, 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Director of the Court, State of Hawai'i*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto*, 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose. . . .

*Gray*, 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura*, 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . .

to discover its true meaning." HRS § 1–15(2) (1993). "Laws *in pari materia*, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*State v. Rauch*, 94 Hawai'i 315, 322–23, 13 P.3d 324, 331–32 (2000) (some citations omitted).

*In re Jane Doe*, 95 Hawai'i at 190–91, 20 P.3d at 623–24 (ellipsis points in original).

## III. DISCUSSION

A. *The Family Court Exceeded Its Statutory Authority Under HRS § 587–71(d) By Ordering DHS To Place Jane In An Unlicensed Foster Family Boarding Home.*

■ DHS argues that the family court cannot award foster custody to an authorized agency and simultaneously restrict that agency's statutory placement authority as a foster custodian. DHS contends (1) that HRS § 587–2 (1993)[15] expressly vests in a foster custodian the duty and right to determine where and with whom a foster child shall be placed in foster care and, therefore, (2) that where the family court usurps the authorized agency's right to place a foster child under its care, the authorized agency cannot be the foster custodian as a matter of law.

DHS further maintains that, if the family court awards foster custody to DHS regarding the placement of a child into a foster home, the legislature has mandated that all prospective foster homes satisfy the stan-

---

15. HRS § 587–2 defines "foster custody" in relevant part as follows:

"Foster custody" means the legal status created pursuant to this section . . . or by an order of court after the court has determined that the child's family is not presently willing and able to provide the child with a safe family home, even with the assistance of a service plan.

(1) Foster custody vests in a foster custodian the following duties and rights:

(A) To determine where and with whom the child shall be placed in foster care; provided that the child shall not be placed in foster care outside the State without prior order of the court; . . .

(B) To assure that the child is provided in a timely manner with adequate food, clothing, shelter, psychological care, physical care, medical care, supervision, and other necessities[.]

. . . .

(2) The court, in its discretion, may vest foster custody of a child in any authorized agency or subsequent authorized agencies, in the child's best interest; provided that the rights and duties which are so assumed by an authorized agency shall supercede the rights and duties of any legal or permanent custodian of the child. . . .

dards adopted by DHS as set forth in Hawai'i Administrative Rules (HAR) § 17–890–33(4) (2002),[16] which, as construed by DHS, precluded DHS from placing Jane with Aunt because (1) Aunt had been identified as a perpetrator of child abuse and (2) there was a judicial determination that Aunt could not provide a safe family home for her own children at the time that her parental rights were terminated or in the reasonably foreseeable future. DHS posits that, inasmuch as (1) DHS could not license Aunt's home as a foster family boarding home and (2) the family court concluded, based on the evidence adduced at the hearing on the GAL's motion for immediate review, that it was in Jane's best interests to remain in the care of Aunt, the family court should have revoked its award of foster custody to DHS and vested foster custody in Aunt. Put simply, DHS argues that, when the family court awards foster custody to an authorized agency, it cannot then "pick and choose which statutorily defined rights and duties are given to a foster custodian."

The GAL counters that the family court's order overriding DHS's decision to remove Jane from Aunt's home comported with the spirit of the Child Protective Act (CPA), HRS chapter 587, which is "to serve the best interests of the children" of Hawai'i. The GAL contends that DHS's foster home licensing policy is merely "a guideline to make appropriate decisions on individual cases, not an absolute mandate," and, therefore, that an award of foster custody to DHS does not preclude the family court from reviewing DHS's placement decisions. The GAL asserts that the family court's exercise of its discretion to avoid an unnecessary removal does not preclude DHS from serving as Jane's foster custodian, given that HRS § 587–2 vests rights and duties in foster custodians other than those relating to placement decisions. Accordingly, the GAL con-

cludes that family court possesses the authority to award foster custody to DHS and to restrict its placement authority in the best interests of the child.

We disagree with the GAL and agree with DHS.

The legislature enacted HRS chapter 587 "to make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm." *See* HRS § 587–1 (Supp.2002). The legislature expressly found that "children deserve and require competent, responsible parenting and safe, secure, loving, and nurturing homes" in order to provide them with the greatest opportunity "to realize their full educational, vocational, and emotional potential." *Id.* In order to effectuate the foregoing purposes, HRS § 587–1 states that "[t]his chapter shall be liberally construed to serve the best interests of the children...."

Moreover, HRS § 571–11(9), *see supra* note 5, provides that "the [family] court shall have exclusive original jurisdiction in proceedings ... [f]or the protection of any child under chapter 587." The primary goal of the family court's jurisdiction in HRS chapter 587 cases is to "prevent harm to the child," *see In re Doe Children,* 96 Hawai'i 272, 285, 30 P.3d 878, 891 (2001), by ascertaining what custodial arrangements are in the best interests of the child—*i.e.,* the "best physical, mental, moral, and spiritual well-being of the child," *see* HRS § 571–46(5) (Supp.2002). *See also In re Jane Doe, Born on June 4, 1987,* 7 Haw.App. 547, 557, 784 P.2d 873, 880 (App.1989) ("[T]he range of permissible choices available to the [family] court is virtually unlimited."). HRS § 587–71(d), *see supra* note 2, provides that, "[i]f the court determines that the child's family home is not a safe family home, ... the court shall vest foster custody of the child in an authorized agency [17] *and enter such further orders*

---

**16.** HAR § 17–890–33(b)(4) provides in relevant part:

(b) Applicants, employees, and foster parents shall be of reputable and responsible character and shall not have a criminal history record, employment history, or background which poses a risk to children in care.

. . . .

(4) Background information which shows that the individual has been identified as and substantiated to be the perpetrator of child abuse or neglect *may* be a basis for denial or revocation of a certificate of approval[.]
(Emphasis added.)

**17.** HRS § 587–2 (1993) defines "authorized agency" as "the department or other public or

*as the court deems to be in the best interests of the child."* (Emphasis added.) *See also In re Doe Children,* 96 Hawai'i at 286, 30 P.3d at 892.

In the event that the family court designates DHS as the authorized agency.to receive a child for placement, the designation endows DHS, as the foster custodian of a child, with certain rights and duties, which include, *inter alia,* placing a foster child in a licensed foster family boarding home [18] that "meets with the standards of conditions, management, and competence set by the department[.]" *See* HRS § 346–17, *supra* note 8. In addition, the CPA vests DHS with the authority to adopt rules and regulations to effectuate the purposes of all public assistance programs, including foster child placement. *See* HRS § 346–14(1) (Supp.2002); *see also* HRS § 346–17(d), *supra* note 8. *Cf. Puana v. Sunn,* 69 Haw. 187, 189, 737 P.2d 867, 870 (1987) ("The [DHS's] authority ... is limited to enacting rules which carry out and further the purposes of the legislation and do not enlarge, alter, or restrict the provisions of the act being administered.").

Of particular moment to the case before us, DHS adopted HAR § 17–828–6 (2001), which provides in relevant part that "[t]he department ... shall authorize foster care services *only in licensed foster family boarding homes* ...." *See also* HAR § 17–890–2 (2002) ("A foster family boarding home shall have a certificate of approval in order to care for children. The certificate of approval shall indicate that the rules for the care of foster children have been met."). With respect to DHS's authority to license a foster family boarding home, HAR § 17–890–33(b)(4), *see supra* note 16, prescribes, *inter alia,* that a foster parent be "of reputable

and responsible character" and states that "[b]ackground information which shows that the [applicant] has been identified as and substantiated to be the perpetrator of child abuse or neglect *may* be a basis for denial" of his or her application for a foster family boarding home license. (Emphasis added.)

As a preliminary matter, we note that, based on the plain language of HAR § 17–890–33(b)(4), *see supra* note 16, the fundamental premise underlying DHS's argument—*i.e.,* that, as a matter of law, DHS is without authority to license Aunt due to her prior CPS history—is fatally flawed. HAR § 17–890–33(b)(4) does not prohibit DHS from licensing Aunt; rather, it affords DHS the *discretion* to deny Aunt's application for a foster family boarding home license, on the basis of "[b]ackground information which shows that [Aunt] has been identified as and substantiated to be the perpetrator of child .abuse or neglect." Thus, DHS's argument that it cannot license Aunt as a matter of law is without merit.

Consequently, the dispositive question is whether the family court, having reposed foster custody in DHS pursuant to HRS § 587–71(d), *see supra* note 2, can "further order" DHS to exercise its discretion and license Aunt's home as a foster family boarding home, thereby overriding DHS's prior decision to deny Aunt's application for a foster family boarding home license and to remove Jane from Aunt's home. We now hold that the family court's· statutory authority to enter "further orders" pursuant to HRS § 587–71(d) extends to an order that has the collateral effect of requiring DHS to exercise its discretion under HAR § 17–890–33(b)(4), *see supra* note 16.[19]

---

private agency, a person, organization, corporation, and benevolent society or organization which is licensed or approved by the department or the court to receive children for control, care, maintenance, or placement."

18. HAR § 17–890–1 (2002) defines "foster family boarding home" as "a home providing family care to minor foster children apart from the children's parents or guardian on a twenty-four hour basis and which has met the state certification requirements."

19. We note that, in the event that the family court had deemed Mother's home to be safe,

HRS § 587–71(c) expressly provides for the family court to restrict DHS's rights and duties as an authorized agency. *See supra* note 8 ("If the court determines that the child's family home is a safe family home with the assistance of a service plan, the court shall place the child ... under the family supervision of an authorized agency ... and enter further orders, including but not limited to restrictions upon the rights and duties of the authorized agency, as the court deems to be in the best interests of the child."). Thus, a reading of HRS § 587–71(c) *in pari materia* with HRS § 587–71(d) further supports our conclusion that the family court possesses the

As we have noted, HRS § 587–71(d) expressly authorizes the family court to "enter such further orders as the court deems to be in the best interests of the child." At the hearing on the GAL's motion for immediate review, Jane's therapist, Judith Rocap, opined, based on approximately ten meetings with Jane, that Aunt provided a "stable and caring environment" for Jane and that, given Jane's allegations of sexual abuse by her father and, possibly, her paternal grandfather, she believed that uprooting Jane from Aunt's home could have an abnormally detrimental effect on Jane's well-being. Moreover, Aunt testified that Jane had adjusted to her new home and had been performing well in school. As such, there was substantial evidence to support the family court's (1) conclusion that it was in Jane's best interests to remain under Aunt's care and (2) decision to exercise its "further orders" power by requiring that DHS, as the authorized agency awarded foster custody of Jane, not remove Jane from Aunt's home. *See In re Doe Children,* 73 Haw. 15, 20–21, 827 P.2d 1144, 1146–47 (1992) (recognizing that the legislature, in enacting HRS § 587–1, "states a clear preference for keeping families together" by placing foster children with relative caretakers).

However, in granting the GAL's motion for immediate review, the family court expressly stated that it was "not going to ... order that the department license [Aunt]," thereby compelling DHS to act in contravention of HAR § 17–828–6, which restricts the placement of foster children to licensed foster family boarding homes, by placing Jane with Aunt. Quite simply, the family court's December 6, 2001 order mandated that DHS violate its own rules and regulations. *See* HRS § 346–17(e), *supra* note 8, ("All rules of the department shall have the force and effect of law...."). Thus, by ordering DHS illegally to place Jane in an unlicensed foster family boarding home, we believe that the family court " 'disregarded rules or princi-

ples of law or practice to the substantial detriment of [DHS] ... [and that its] decision clearly exceed[ed] the bounds of reason.' " *In re Jane Doe,* 95 Hawai'i at 189, 20 P.3d at 622 (citations omitted).

In light of the foregoing, we vacate and remand the present matter to the family court and instruct the family court to direct DHS to exercise its discretion under HAR § 17–890–33(b)(4) as to whether to license Aunt's home as a foster family boarding home. In the event that DHS opts to license Aunt's home, the family court, without more, may order DHS to place Jane in Aunt's licensed boarding home. In the event that DHS, in the exercise of its discretion, does not license Aunt's home, the family court has two options. The family court may state its reasons for concluding that DHS has committed an abuse of discretion and, pursuant to its "further orders" power under HRS § 587–71(d), may order DHS to license Aunt's home as a foster family boarding home as it deems appropriate. In the alternative, the family court may order DHS to place Jane in a non-relative, licensed family boarding home.

**B.** *The Family Court Exceeded Its Statutory Authority By Ordering DHS To Make Foster Care Board Payments To Aunt, An Unlicensed Foster–Care Provider.*

 DHS urges that the family court exceeded its statutory authority by ordering DHS to make foster care board payments to Aunt, an unlicensed foster-care provider. In this connection, DHS maintains that it has no legal obligation to make the payments, inasmuch as that obligation extends only to licensed foster homes, pursuant to HAR § 17–828–5(c) (2002).[20] DHS reiterates its argument that, as a matter of law, DHS is not Jane's foster custodian and that Aunt, "the true foster custodian of [Jane] as defined by

---

statutory authority to order that DHS place a foster child in a particular home, based on a finding that the placement is in the best interests of the child, and to "further order" that DHS exercise its discretion and license that home in compliance with HRS chapter 587 and DHS's administrative rules.

**20.** HAR § 17–828–5(c) provides that "[f]oster care board payments shall be made for the care and maintenance of eligible children in *licensed* foster family homes, group homes, and child caring institution...." (Emphasis added.)

law," bears the financial responsibility for Jane.

The GAL, on the other hand, contends (1) that, under HRS § 587–71(d), *see supra* note 2, the family court possesses the authority to issue appropriate orders to protect the interests of a foster child and (2) that DHS cannot place restrictions and limitations on its obligation to render foster care board payments that are not consistent with the express purposes of the CPA, which are "to make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm."

 Generally, this court gives deference to decisions of the family court to issue orders that are in the best interests of a child. *In re Doe Children,* 96 Hawai'i at 286, 30 P.3d at 892. "However, the family court's jurisdiction is not so broad that it extends to the ability to simply order anyone to pay for needed services. Obviously, there must be a legal basis establishing an obligation to pay." *Id.* Pursuant to HAR § 17–828–5(c), *see supra* note 20, DHS's legal obligation to render foster care board payments is restricted to *licensed* "foster family homes, group homes, and child caring institutions."

In the present matter, the family court ordered DHS to make foster care board payments to Aunt, an unlicensed foster-care pro-

vider. Thus, inasmuch as (1) DHS was not legally obligated to pay Aunt and (2) the family court's "further orders" power under HRS § 587–71(d), *see supra* note 2, does not extend to an order that, in effect, creates a legal obligation to subsidize an illegal foster care boarding home, *see In re Doe Children,* 96 Hawai'i at 286 n. 18, 30 P.3d at 892 n. 18 (rejecting the argument that "the family court's broad authority under HRS chapter 587 to issue orders in [the] best interest [of a child] can itself create [a] legal obligation to pay for services" received by foster children), the family court exceeded its statutory authority in ordering DHS to make foster care board payments to Aunt.[21]

## IV. CONCLUSION

Accordingly, we vacate the family court's orders, filed on December 6, 2001 and January 10, 2002, and remand this matter for further proceedings consistent with this opinion.

---

21. We note, however, that, on remand, DHS will be subject to a legal obligation to make foster care board payments either to Aunt—if she is licensed—or to a non-relative, licensed foster family boarding home.