Electronically Filed
Supreme Court
SCWC-16-0000441
13-DEC-2019
08:10 AM

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

IN THE INTEREST OF R CHILDREN

SCWC-16-0000441

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000441; FC-S NO. 14-00025)

DECEMBER 13, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY NAKAYAMA, J.

This case contemplates the interaction between two similar statutory provisions that provide for the termination of parental rights.  On December 1, 2016, the Family Court of the First Circuit (family court) terminated Petitioner/Appellant Father's parental rights to his child (KK) pursuant to Hawaiʻi Revised Statutes (HRS) § 587A-33 (Supp. 2015), a provision of the Child Protective Act (CPA) (the CPA Provision).  Father appealed. The Intermediate Court of Appeals (ICA) observed that the CPA

Provision requires the family court to find that the "proposed permanent plan is in the best interests of the child" before terminating a parent's parental rights.  HRS § 587A-33(a)(3). The ICA held that the family court's termination of Father's parental rights was not permitted by the plain language of the CPA Provision because the family court found that Respondent/Appellee Department of Human Services' (DHS) permanent plan for KK was not in KK's best interests.  The ICA nevertheless affirmed the family court's termination of Father's parental rights under a provision of the family court statutes, HRS § 571-61(b)(1)(E) (Supp. 2016) (the Family Court Provision).

On application for writ of certiorari, Father asks whether the ICA erred in substituting the Family Court Provision for the CPA Provision as the basis for terminating his parental rights.

We hold that the ICA erred in substituting the Family Court Provision for the CPA Provision as the basis for affirming the family court's termination of Father's parental rights when the CPA Provision contains a requirement not present in the Family Court Provision.

Accordingly, we vacate the ICA's judgment on appeal and remand to the family court for further proceedings.

## I.   BACKGROUND

### A.   Family Court Proceedings[1]

Mother has six children.  Father is the father of the youngest child, KK, who was born on December 20, 2012.[2]  KK was three years old at the time DHS moved to terminate Father's parental rights.  At the time of the termination of parental rights hearing, Mother was no longer in a relationship with Father.  Mother obtained a Temporary Restraining Order (TRO) against Father on February 10, 2014.

On February 18, 2014, DHS filed a Petition for Family Supervision over five of the children,[3] including KK, after learning that, in 2013, Father had kicked one of Mother's older children in the chest and punched Mother in the head when she tried to pick up the child.  In DHS's petition, DHS stated that "[t]he behaviors of [Father] are violent, threatening violence, and/or out of control."  DHS also remarked that "[Father] is believed to also have substance abuse issues (alcohol, marijuana and Ice)[.]"  DHS stated that Mother could not adequately supervise or protect the children from harm, noting the extensive history of domestic violence in Mother and Father's relationship

---

[1]   The Honorable Steven M. Nakashima presided.

[2]   Mother's five other children share a different father.

[3]   One of the children was already in the care of his maternal grandparents at this time.

and between Mother and the father of her older children. However, DHS opined that Mother "can provide a safe family home for the children with the assistance of a service plan."

Because the family court found that "there [was] an adequate basis to sustain the petition[,]" the family court ordered Mother and Father to follow a service plan created by DHS. The February 2014 service plan directed Mother to undergo a psychological evaluation, domestic violence/anger management education, comprehensive counseling and support services, and enhanced healthy start services.[4] The February 2014 service plan directed Father to undergo substance abuse treatment, random urinalysis, domestic violence/anger management education, psychological evaluation, and comprehensive counseling and support services. The February 2014 service plan also directed both Mother and Father to cooperate with a DHS social worker.

Over the course of the following seventeen months, DHS created four subsequent service plans. Each service plan indicated that, if Mother and Father were able to "successfully complete and utilize the services that [were] outlined in [the] service plan" and demonstrate that KK was "no longer at risk of

---

[4]    Hawaii's Healthy Start program is a home visiting service intended to "foster family functioning, promote child health/development, and enhance positive parenting skills to address the risk of child maltreatment through linkages with community resources." Healthy Start Program, State of Hawaiʻi, Department of Health (Oct. 20, 2019, 2:17 PM), https://health.hawaii.gov/mchb/home/healthy-start-program/).

abuse or neglect in the family home[,]" DHS could recommend that the case be closed. However, each subsequent service plan warned Mother and Father again that their "parental and custodial duties and rights . . . may be terminated . . . unless [they were] willing and able to provide [KK] with a safe family home within the reasonable period of time specified in [the] family service plan."

On July 23, 2015, DHS filed a motion in the family court to terminate Mother and Father's parental rights to KK and award permanent custody of KK to DHS (Motion to Terminate). DHS based its motion on the ongoing domestic violence in Mother and Father's relationship, Father's continued substance abuse, and Mother and Father's failure to "change to be protective of their children." DHS concluded that Mother and Father were unable, now or in the foreseeable future, to provide a safe home without the assistance of a court-ordered service plan. In the motion, DHS proposed a permanent plan which would place KK with adoptive parents after DHS gained permanent custody of KK.[5]

B. **Termination Hearings**

Hearings on the Motion to Terminate took place on March 8, 2016 and April 4, 2016.

---

[5] KK had been living with "resource caregivers" who were his hānai relatives. KK's resource caregivers indicated to DHS that they wished to adopt KK.

5

Mother testified on April 4, 2016. Mother testified that she loved KK and that KK had bonded with her and called her "Mommy" during their supervised visits. Mother testified that she had a good record of attending her supervised visits with KK. Mother also testified that if DHS instructed her not to allow contact between KK and Father, she would comply. Mother stated that her paycheck from her job at a restaurant would support rent and utilities in a low-income housing apartment.

Father also testified on April 4, 2016. Father testified that he had bi-weekly supervised visits with KK and that he consistently attended those visits. Father stated that the visits were pleasant, but that KK was "spoiled." Father testified that these proceedings began "[b]ecause of [his] anger issues, drug use, and abuse[,]" but stated that "[i]t's all good now" because he was working more and was subjected to random drug tests at work. Father admitted, however, that there had been a period during which he consistently missed drug tests. Father also stated that he had lost parental rights to another child with a different mother. Father testified that 60 percent of his paycheck went to child support for four children. Father stated that he wanted to have more visits with KK, but that he understood one of the reasons he was unable to have more visits was his inconsistency with drug testing.

Annette Shanks (Shanks), a DHS social worker assigned to KK's case in 2014, testified on behalf of DHS on March 8, 2016. Shanks testified that DHS believed neither Mother nor Father were currently willing or able to provide a safe family home for KK, even with the assistance of a service plan, and that it was not reasonably foreseeable that they would be able to do so within a reasonable period of time. DHS's permanent plan for KK envisioned his adoption by his resource caregivers. Shanks testified that this plan was in KK's best interests because he was very close with his resource caregivers, who wanted to adopt him. The family court found Shanks's testimony credible.

The family court issued its "Order Terminating Parental Rights of [Father] and Order Regarding Insufficient Basis Currently to Terminate Parental Rights of [Mother]" on May 23, 2016 and issued its Findings of Fact, Conclusions of Law, and Order on December 1, 2016.[6] Pursuant to HRS § 587A-

---

[6]

ACCORDINGLY, IT IS HEEBY [sic] ORDERED that:
1. DHS' Motion to Terminate Parental Rights Regarding the Child filed on July 23, 2015 is granted in part as it applies to [Father] and denied in part as it applies to Mother.
2. The prior award of foster custody and the existing service plan as to [Father] are revoked as the parental rights of [Father] are hereby terminated.
3. Further, pursuant to HRS § 587A-33(b)(5), [Father] is excluded from participating in any subsequent proceedings and he shall not be notified of future hearings and he shall not appear at future hearings unless he receives legal notice that specifically requires his appearance.
4. However, pursuant to HRS § 587A-33(c) unless otherwise ordered by the Court, or if the Child is ultimately adopted,
(continued...)

7

33,[7] the CPA Provision, the family court found that "the evidence presented at trial establishes that there is clear and convincing evidence that [Father's] parental rights should be terminated, however, as to [Mother], there is insufficient evidence to terminate her parental rights, at this time."  The family court also found that DHS's proposed permanent plan of placing KK in adoption was not in KK's best interests.  The family court rejected DHS's permanent plan to place KK in adoption in order to "afford Mother an opportunity for reunification with [KK] if Mother is able to comply with the requirements set forth [by DHS]."

## C.   ICA Proceedings

Father filed a notice of appeal from the Order Terminating Parental Rights on May 31, 2016.  In his opening brief, Father argued, inter alia, that the circuit court's termination of Father's parental rights after finding that DHS's permanent plan was not in KK's best interests "is contrary to the

---

[6](...continued)
> [Father] shall retain the continuing responsibility to support the Child, including repaying the cost of any and all care, treatment, or any other service provided for the Child's benefit.
> 5.   The prior award of foster custody as it applies to Mother shall continue and DHS is not awarded permanent custody of the Child.
> 6.   The DHS shall prepare a plan to achieve permanency for the Child within 3 months of May 5, 2016.  HRS § 587A-33(h)(1).

[7]   See infra Section III. A.

statutory provisions of Section 587A-33(b) [the CPA Provision.]"

The ICA agreed. The ICA held that because the family court did not find the permanent plan of adoption to be in KK's best interests, the requirements of the CPA Provision were not met and the CPA Provision therefore provided no basis for terminating Father's parental rights. In the Interest of R Children, No. CAAP-16-0000441, 2018 WL 4346884 (App. Sept. 12, 2018) (mem.). Nevertheless, the ICA held that the family court did not err in terminating Father's parental rights, because HRS § 571-61(b)(1)(E),[8] the Family Court Provision, provides for the termination of parental rights without regard to a permanent plan, and "[t]he legislative history is clear that HRS chapter 587 was not intended to displace the provisions of HRS chapter 571, but rather to incorporate its provisions into a unified proceeding." (Citing S. Stand. Comm. Rep. No. 537-86, in 1986 Senate Journal, at 1023.) The ICA therefore concluded that

---

[8]     The Family Court Provision, HRS § 571-61(b)(1)(E), provides,

> The family courts may terminate the parental rights in respect to any child as to any legal parent:
>
> . . . .
>
> (E)   Whose child has been removed from the parent's physical custody pursuant to legally authorized judicial action under section 571-11(9), and who is found to be unable to provide now and in the foreseeable future the care necessary for the well-being of the child[.]

"[h]aving met the standard necessary for termination under [the CPA Provision] . . . termination of Father's parental right is permissible under [the Family Court Provision]." The ICA affirmed the family court's judgment terminating Father's parental rights to KK.

Father filed an application for writ of certiorari.

## II. STANDARDS OF REVIEW

### A. Family Court Decisions

> Generally, the family court possesses wide discretion in making its decisions and those decision[s] will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

Fisher v. Fisher, 111 Hawaiʻi 41, 46, 137 P.3d 355, 360 (2006) (quoting In re Doe, 95 Hawaiʻi 183, 189-90, 20 P.3d 616, 622-23 (2001)).

The family court's conclusions of law, on appeal, are reviewed de novo under the right/wrong standard. In re Jane Doe, 101 Hawaiʻi 220, 227, 65 P.3d 167, 174 (2003). Conclusions of law, "consequently, are not binding upon an appellate court and are freely reviewable for their correctness." Id. (internal quotation marks, citation, and brackets omitted).

## B.    Statutory Interpretation

"Statutory interpretation is a question of law reviewable de novo."  State v. Wheeler, 121 Hawaiʻi 383, 390, 219 P.3d 1170, 1177 (2009) (internal quotation marks and citations omitted).  Our construction of statutes is guided by the following rules:

> First, the fundamental starting point for statutory-interpretation is the language of the statute itself.  Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.  Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

First Ins. Co. of Haw. v. A&B Props., 126 Hawaiʻi 406, 414, 271 P.3d 1165, 1173 (2012) (internal citations omitted).

### III.    DISCUSSION

In his application for writ of certiorari, Father argues that the ICA gravely erred in substituting the Family Court Provision as the basis for affirming the family court's decision.

### A.    The CPA Provision provides for the termination of parental rights only when the family court finds that the proposed permanent plan is in the best interests of the child.

As a threshold matter, we agree with the ICA that the CPA Provision only provides for the termination of a parent's parental rights if the family court finds that the permanent plan

11

is in the child's best interests.  Because the family court here found that DHS's permanent plan was not in KK's best interests, the family court erred in terminating Father's parental rights to KK under the CPA Provision.  The CPA Provision, HRS § 587A-33, provides,

> **Termination of parental rights hearing.**  (a) At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:
> (1)  A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child with a safe family home, even with the assistance of a service plan;
> (2)  It is not reasonably foreseeable that the child's parent whose rights are subject to termination will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care;
> (3)  The proposed permanent plan is in the best interests of the child. In reaching this determination, the court shall:
> (A)  Presume that it is in the best interests of the child to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home; and
> (B)  Give greater weight to the presumption that the permanent plan is in the child's best interest, the younger the child is upon the child's date of entry into foster care; and
> (4)  The child consents to the permanent plan if the child is at least fourteen years old, unless the court consults with the child in camera and finds that it is in the best interest of the child to proceed without the child's consent.
> (b)  If the court determines that the criteria set forth in subsection (a) are established by clear and convincing evidence and the goal of the permanent plan is for the child to be adopted or remain in permanent custody, the court shall order:

12

(1) That the child's parent's parental rights be terminated;
(2) Termination of the existing service plan and revocation of the prior award of foster custody;
(3) That permanent custody of the child be awarded to an appropriate authorized agency;
(4) An appropriate permanent plan; and
(5) The entry of any other orders the court deems to be in the best interests of the child, including restricting or excluding unnecessary parties from participating in adoption or other subsequent proceedings.

. . . .

(h) If the court determines that the criteria set forth in subsection (a) are not established by clear and convincing evidence, the court shall order:
(1) The preparation of a plan to achieve permanency for the child;
(2) The entry of any orders that the court deems to be in the best interests of the child;
(3) A periodic review hearing to be held within six months after the date of the last permanency hearing; and
(4) A permanency hearing to be held within twelve months of the date of the last permanency hearing.

HRS § 587A-33 (Supp. 2015) (emphasis added). In other words, the CPA Provision provides that the family court shall terminate a parent's parental rights if it finds that: (1) the parent is not able to provide a safe family home for the child now or within a reasonable period of time (HRS §§ 587A-33(a)(1)-(2)); (2) the proposed permanent plan is in the best interests of the child (HRS § 587A-33(a)(3)); and (3) the child consents to the permanent plan if the child is at least fourteen years old (HRS § 587A-33(a)(4)). Pursuant to section (h) of the CPA Provision, if the family court does <u>not</u> find that all of these requirements are

13

met, the family court shall take further steps to establish permanency for the child. HRS § 587A-33(h). However, nothing in the CPA Provision indicates that the family court can terminate a parent's parental rights if fewer than all of the above requirements are met.

Here, the CPA Provision requirements were not met. The family court concluded that "DHS has shown by clear and convincing evidence that [Father] is not presently willing and able to provide the Child with a safe family home, even with the assistance of a service plan" and that "it is not reasonably foreseeable that [Father] will become willing and able to provide the Child with a safe family home, even with the assistance of a service plan, within a reasonable period of time." However, the family court did not make equivalent parental unfitness findings as to Mother, and did not terminate Mother's parental rights. DHS's proposed permanent plan was for DHS to obtain permanent custody of KK, and for KK's resource caregivers to thereafter adopt KK. Therefore, DHS's proposed permanent plan did not anticipate Mother's ability to regain custody of KK. Accordingly, the family court found that "the Permanent Plan is not in the Child's best interests[.]" Citing various subsections

14

of the CPA Provision,[9] the family court terminated Father's parental rights.

The family court's order terminating Father's parental rights without finding that the proposed permanent plan was in KK's best interests contravenes the plain language of the CPA Provision. The family court found by clear and convincing evidence that the requirements set forth in HRS §§ 587A-33(a)(1) and (a)(2) were met, but explicitly determined that the requirement of HRS § 587A-33(a)(3) was not met.[10] Because not all of the requirements set forth in the CPA Provision were met, the statute did not provide the family court authority to terminate Father's parental rights. See HRS § 587A-33(h).

"[W]here the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." Wheeler, 121 Hawaiʻi at 390, 219 P.3d at 1177. The requirement that the family court find the permanent plan to be in the best interests of the child before terminating a parent's parental rights is plain on the face of the CPA Provision. Accordingly, the family court erred in terminating

---

[9]    See supra note 6.

[10]    The family court made no specific determination as to HRS § 587A-33(a)(4) because KK was less than fourteen years old.

Father's parental rights under the CPA Provision.[11]

**B.    The ICA erred in substituting the Family Court Provision as the basis for terminating Father's parental rights because the CPA Provision contains an additional requirement.**

In 1965, the Legislature enacted the statute that is now the Family Court Provision as part of "A Bill for an Act to Establish Family Courts" with the purpose of "gather[ing] together all judicial activities which relate to children and the family."  H.B. 879, 3rd Leg., Gen. Sess. (Haw. 1965); S. Stand. Comm. Rep. No. 272, in 1965 Senate Journal, at 917.  In 1983, Act 171 enacted the first version of the CPA, which included the Family Court Provision, and was codified as HRS chapter 587. 1983 Haw. Sess. Laws Act 171, at 320-45.  In 2010, Act 135 repealed HRS chapter 587 and divided its contents into the new CPA, codified as HRS chapter 587A, and the "Family Courts" chapter, codified as HRS chapter 571.  2010 Haw. Sess. Laws Act 135, § 1 at 282-311.

There is considerable overlap between the new CPA and the Family Courts chapter, both with respect to the criteria for instigating the termination of parental rights and the procedure for terminating a parent's parental rights.  The new CPA was

_____

[11]    The CPA Provision, HRS § 587A-33, provided the sole basis for the family court's judgment terminating Father's parental rights.  "[T]he rights to conceive and to raise one's children are essential, . . . basic civil rights of man protected by the United States Constitution." In re Doe, 99 Hawaiʻi 522, 532, 57 P.3d 447, 457 (2002) (internal quotation marks and citations omitted).  As such, nothing less than strict compliance with the statute invoked is sufficient to terminate parental rights.

enacted to "ensure[] that the Child Protective Act is in conformity with Federal Title IV-E provisions."[12]  S.B. 2716, Conf. Com. Rep. 112-10, at 764.  The Legislature's desire to conform with federal Social Security Act provisions might explain why the two similar chapters exist concurrently.

Despite the overlap in the CPA and the Family Courts chapter, the Family Court Provision and the CPA Provision are not interchangeable.  The Family Court Provision cannot serve as a substitute for the CPA Provision when the CPA Provision contains an additional requirement.  The ICA therefore erred in affirming the family court's order terminating Father's parental rights under the Family Court Provision.

The ICA concluded that "[a]n award of permanent custody under HRS section 587A-33 [the CPA Provision] involves essentially the same criteria and material elements as termination of parental rights under HRS section 571-61(b)(1)(E) [the Family Court Provision]."  The ICA also referred to case law and legislative history demonstrating that the two statutes are meant to be used together, not one to the exclusion of the other.  The ICA therefore held that "termination of Father's parental right[s] is permissible under HRS section 571-61(b)(1)(E) [the

---

[12]    Title IV-E of the Social Security Act (42 U.S.C. §§ 671-679(b)) provides federal reimbursement to states for a portion of the maintenance and administrative costs of foster care for children who meet federal eligibility requirements.  42 § U.S.C. 672.

Family Court Provision]."

The ICA is correct that the CPA and the Family Courts chapter can be used together, but erred in substituting the Family Court Provision for the CPA Provision when the two statutes are not interchangeable.  The procedure set forth by the CPA Provision requires the family court to find that the permanent plan is in the best interests of the child before terminating a parent's parental rights.  HRS § 587A-33(a)(3).  In ignoring the procedural requirement of the permanent plan finding set forth by the CPA Provision, the ICA disregarded an important requirement of the parental rights termination process.

The Family Court Provision permits termination of parental rights without regard to a permanent plan.  The Family Court Provision, HRS § 571-61(b)(1)(E) (Supp. 2016), provides

> (1)     The family courts may terminate the parental rights in respect to any child as to any legal parent:
>
> . . . .
>
> (E)     Whose child has been removed from the parent's physical custody pursuant to legally authorized judicial action under section 571-11(9), and who is found to be unable to provide now and in the foreseeable future the care necessary for the well-being of the child[.]

By contrast, the CPA Provision requires more before the family court can terminate a parent's parental rights.  As previously discussed, the CPA Provision requires the family court to find

that DHS's proposed permanent plan is in the best interests of the child.  HRS § 587A-33(a)(3).  The ICA concluded that the CPA Provision and the Family Court Provision can be read together to allow the family court's termination of Father's parental rights.  However, the ICA's analysis substituted the Family Court Provision for the CPA Provision as the basis for terminating Father's parental rights.  In doing so, the ICA's analysis disregarded HRS § 587A-33(a)(3), the portion of the CPA Provision that requires the family court to find that the proposed permanent plan is in the best interests of the child.

With respect to statutory interpretation, this court has previously stated,

> [i]n the construction of a statute the general law is that a statute should be so interpreted to give it effect; and we must start with the presumption that our legislature intended to enact an effective law, and it is not to be presumed that legislation is a vain effort, or a nullity.

State v. Harada, 98 Hawaiʻi 18, 48, 41 P.3d 174, 204 (2002).

Moreover,

> It is the generally accepted rule of statutory construction that unless a legislative intention to the contrary clearly appears, special or particular provisions control over general provisions, terms or expressions . . . . It is also elementary that specific provisions must be given effect notwithstanding the general provisions are broad enough to include the subject to which the specific provisions relate.

State by Kashiwa v. Coney, 45 Haw. 650, 662, 372 P.2d 348, 354 (1962), overruled on other grounds by City and Cty. of Honolulu

19

v. Bonded Inv. Co., Ltd., 54 Haw. 385, 507 P.2d 1084 (1973).  Put differently, this court presumes that the legislature does not enact statutes with language that has no meaning and has concluded that specific statutes control over general statutes.

The ICA erred in disregarding the permanent plan requirement of the CPA Provision because the plan furthers the legislature's intent to serve the best interests of the child. The CPA's stated purpose is to "make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm."  HRS § 587A-2 (Supp. 2015). The statute instructs that "[t]his chapter shall be liberally construed to serve the best interests of the children affected and the purpose and policies set forth herein."  HRS § 587A-2.

The CPA also explicitly calls for the implementation of permanent plans.  The CPA's statement of purpose references permanent plans four times.  HRS § 587A-2.  Also, the CPA "makes provisions for the service, treatment, and permanent plans for [] children and their families."  HRS § 587A-2 (emphasis added). The legislative history of Act 316, which enacted a previous version of HRS chapter 587, states that the CPA was "to provide for timely permanent planning by incorporating in the Child Protective Act certain provisions of the termination of parental rights statute[.]"  H. Stand. Comm. Rep. No. 236-86, in 1986

20

House Journal, at 1088 (emphasis added). The CPA's purpose and legislative history convey the legislature's intent that the CPA provide for permanent plans that are in the best interests of children. As such, the ICA erred in substituting the Family Court Provision to circumvent the permanent plan requirement of the CPA Provision.

Moreover, the permanent plan requirement in the CPA Provision adds an additional, specific criterion that we cannot disregard. See Kashiwa, 45 Haw. at 662, 372 P.2d at 354. The permanent plan requirement in the CPA Provision is specific because, as discussed previously, it sets forth an additional criterion not present in the Family Court Provision. This interpretation does not contravene clear legislative intent to the contrary. Using the statutes together but allowing the specific provision to control where the family court does not find the permanent plan to be in the child's best interests comports with the legislature's intent. Therefore, the specific permanent plan requirement of the CPA Provision controls. As such, the ICA erred in disregarding the permanent plan requirement and concluding that the CPA Provision's termination criteria are "essentially the same" as the Family Court Provision's criteria, when the CPA Provision clearly contains an additional criterion.

Finally, neither of the two cases that the ICA cited in determining that the Family Court Provision was an adequate substitute for the CPA Provision support that proposition. First, the ICA cited its holding in In re Male Child Born on May 27, 1983, 8 Haw. App. 66, 72, 793 P.2d 669, 672 (1990) that the termination criteria under the CPA Provision and the Family Court Provision are "essentially the same." However, in Male Child, the ICA was construing the phrase "foreseeable future," contained in the Family Court Provision, and did not consider the CPA's permanent plan requirement. Id. The ICA noted that, under a different CPA provision, HRS § 587-73 (Supp. 1989), a "reasonable period of time . . . shall not exceed three years[.]" Id. at 69-70, 793 P.2d at 671. The ICA therefore held that, reading the statutes together, "foreseeable future" means three years from the filing date of the petition for termination of parental rights, consistent with the CPA Provision. Id. at 72, 793 P.2d at 672. Male Child does not reference the CPA Provision's requirement that the permanent plan be in the best interests of the child, and in disregarding it, only imports the temporal provisions of the Family Court Provision and the CPA Provision. Therefore, Male Child does not support the ICA's invocation of the Family Court Provision to affirm the family court's improper termination of Father's parental rights under

22

the CPA Provision.

The ICA also cited our decision in In re Doe Born on May 22, 1976, 84 Hawaiʻi 41, 928 P.2d 883 (1996) to conclude that the CPA Provision and the Family Court Provision are not mutually exclusive. In Doe, an action was initiated involving a minor under certain family court provisions. Id. at 43, 928 P.2d at 885. This court held, inter alia, that the family court was permitted to address the problems that arose under the CPA regardless of whether the action was initiated under family court provisions "or by way of a formal chapter 587 [CPA] petition." Id. at 52, 928 P.2d at 894. We referred to how the statutes interact generally and made no reference to the specific provisions that govern the termination of parental rights or the additional permanent plan criterion in the CPA Provision. Therefore, Doe is also not analogous to the specific statutory conflict at issue here.

Male Child and Doe stand for the general proposition that the CPA Provision and the Family Court Provision can be used together to ensure that the best interests of the child are provided for. However, when the family court finds that the proposed permanent plan is not in the child's best interests, the CPA Provision and the Family Court Provision cannot be "read together" to circumvent the CPA Provision's permanent plan criterion.

23

## IV.   CONCLUSION

We agree with the ICA that the family court erred in terminating Father's parental rights under HRS § 587A-33, the CPA Provision, without finding that DHS's proposed permanent plan was in KK's best interests.

However, the ICA erred by invoking the Family Court Provision to affirm the family court's termination of Father's rights.  Because the Family Court Provision does not reference a permanent plan, the ICA's substitution of the Family Court Provision for the CPA Provision disregards the permanent plan requirement set forth in the CPA Provision.  The CPA envisioned the implementation of permanent plans to bring safety and stability to the children within its jurisdiction.  By ignoring the permanent plan requirement of the CPA Provision, the ICA contravenes the explicit purpose of the CPA.

We therefore vacate the ICA's judgment on appeal and remand to the family court for further proceedings consistent with this opinion.

| | |
|---|---|
| Randal I. Shintani for petitioner/father-appellant | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Julio C. Herrera, Ian T. Tsuda, and Patrick A. Pascual, Deputy Attorneys General, for respondent-appellee Department of Human Services | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |



24